1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
TACOMA DIVISION

10

CITY BEVERAGES, L.L.C., d/b/a Olympic
Eagle Distributing, a Missouri limited
liability company with its principal place of
business in Washington,

No. _____

11

12

Plaintiff,

COMPLAINT FOR EQUITABLE
RELIEF

13

v.

14

CROWN IMPORTS LLC, d/b/a
Constellation Brands Beer Division, a
Delaware corporation with its principal
place of business in Illinois;
CONSTELLATION BRANDS, Inc, a
Delaware corporation with its principal
place of business in New York,

15

16

17

18

Defendants.

19

20

## I.   SUMMARY OF THIS SUIT FOR EQUITABLE RELIEF

21

1.   Olympic Eagle is a multi-generational family-owned and operated business based in

22

Puyallup, Washington.  It distributes beer, including Anheuser-Bush products and some non-

23

alcohol drinks. Olympic Eagle has 240 employees, and the next generation of the family is

24

beginning the transition to running the company.

25

COMPLAINT FOR EQUITABLE RELIEF – 1

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

2.   Since 2003 Olympic Eagle has been exclusively responsible in its territory to grow the products owned by Crown Imports doing business as Constellation Brands Beer Division ("Constellation"). Olympic Eagle's distributor agreement has no term but can be terminated for cause, including performance standards the parties set each year.

3.   Crown is a wholly-owned subsidiary of Constellation Brands, Inc. which is a publicly traded on the New York Stock Exchange.  Constellation Brands, Inc. says it is "the #1 brewer and seller of imported beer in the U.S. market."  It has "an exclusive perpetual brand license to import, market, and sell [its] Mexican beer portfolio in the U.S." which includes nine of the 15 top-selling imported beer brands in the U.S. such as Corona and Modelo Especial.

4.   Olympic Eagle has invested millions of dollars in growing these brands locally, including paying more than $3 million directly to Constellation for a national marketing fund and investing additional millions on local advertising and promotions.  These investments have paid off, with Olympic Eagle succeeding in growing the case equivalent sales in its territory by an average of 8.9 percent annually from 2012 to 2022.

5.   Olympic Eagle has received Constellation awards and accolades for distributors.

6.   Corona is among the best-selling import beers, and Constellation Brands is now third largest beer company in the United States. Constellation products are the second largest by sales volume and most important for growth, contributing more than 80 percent of Olympic Eagle's profit growth over the last year.

7.   On September 9, 2022, and without prior warning, Constellation gave Olympic Eagle notice (dated September 8) that it would terminate distribution rights and gave it 60 days to find a buyer.  The notice was sent on Constellation Brands, Inc. stationary and signed by the Chief Customer Officer for the Constellations Brands Beer Division.  He is listed on the leadership page of the Constellation Brands, Inc. website.

COMPLAINT FOR EQUITABLE RELIEF – 2

FG: 100643912.2

8.   Constellation is not terminating Olympic Eagle for any cause, and gave no reason for the termination.

9.   In a presentation to the company's bankers a few days after the termination notice, Olympic Eagle's CFO compared the impact on the business to the fiery crash of the Hindenburg, the German Rigid Airship.  Olympic Eagle will go from being very profitable to losing nearly half a million dollars per month, or $5.5 million per year, even after cutting all Constellation-related expenses. Unless Olympic Eagle can quickly develop a new and untried business model it will remain unprofitable and may be forced to sell out.

10. A few days after it received the termination notice, Olympic Eagle received a call from the CEO of its largest competitor, Columbia Beverages.  When Olympic Eagle's CEO, Steve Knight, returned the call, Columbia's CEO Chris Steffanci said his company was Constellation's "preferred buyer," and he offered to pay seven times 12 months trailing earnings, which would be about $70 million.

11. Under Washington States Beer Wholesaler distributor law, any successor distributor is responsible to pay Olympic Eagle the "fair market value" of the distribution rights.  This remedy is non-exclusive of the distributor's other legal rights.

12. Olympic Eagle believes the fair market value of its Constellation distribution rights are far in excess of the amount offered by Columbia.  And even if it receives fair market value for these brands, Olympic Eagle will suffer ongoing harm that cannot be readily calculated because it will be unable to effectively compete for and retain some of its business for remaining brands.

13. Three other Washington State distributors received a termination notice from Constellation, two in Eastern and one in Western Washington.  Each has received just one offer to buy their rights even though there are multiple potential buyers who would benefit from owing the Constellation rights.

COMPLAINT FOR EQUITABLE RELIEF – 3

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

14. King Beverages in Spokane received the same financial offer as Olympic Eagle--seven times 12 months trailing earnings--from Odom.  King Beverages CEO, Peter Rusnak, called Columbia's CEO Chris Steffanci to see if it would make any offer for the Constellation distribution rights.  Mr. Steffanci said "not at this time."

15. Odom is also a competitor in Olympic Eagle's territory and would benefit from having the Constellation rights.  Olympic Eagle wrote to Odom and two other distributors who operate in its territory asking if they were interested in making an offer.   Odom responded in a call with Olympic Eagle's representatives that it will not make an offer for the Constellation rights.

16. Even assuming--despite the apparent collusion among potential bidders--that Olympic Eagle received fair market value for its Constellation distribution rights, it faces the very real threat of becoming and remaining unprofitable.

17. Constellation terminated several distributors in California without cause in 2018, some of which were also multigenerational family businesses. Several of those businesses became unprofitable and were forced to sell.  They were unable to recover from the loss of Constellation products because they could not buy replacement brands.

18. Over the years, Olympic Eagle has tried to buy significant brands from its competitors, and has been told they weren't for sale. It has no prospects to obtain the rights for any brands significant enough to replace Constellation.

19. Under its distributor agreement with Constellation, Olympic Eagle cannot be terminated except for cause.  Olympic Eagle is also protected from termination without cause under Washington State's Franchise Investment Protection Act, RCW 19.100.180.

20. Olympic Eagle's relationship with Constellation satisfies the three elements of a franchise under RCW 19.100:  (1) it paid a franchise fee in the form of mandatory national marketing fees; (2) it operated under a marketing plan as required in part by Constellation, including mandatory sales goals, pricing promotion programs, advertising and marketing

COMPLAINT FOR EQUITABLE RELIEF – 4

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

FG: 100643912.2

1   spending, point of sales program and training; and, (3) it was substantially associated with
2   Constellation trademarks as it was required to advertise and promote the brands to its customers,
3   retail stores and bars and restaurants.

4        21. Olympic Eagle will suffer irreparable harm if a preliminary injunction is not entered
5   to prevent Constellation from violating the Washington Franchise Protection Act and breaching
6   the distribution contract. The last court day before the 60 days runs on the notice of termination
7   is November 4, 2022.

8   ## II.   **PARTIES**

9        22. In this Complaint, the term "Olympic" means plaintiff City Beverages, L.L.C. d/b/a
10   Olympic Eagle Beverages; and the term "Constellation" means defendant Crown Imports LLC,
11   d/b/a Constellation Brands Beer Division and defendant Constellation Brand, Inc. unless
12   otherwise stated.

13        23. Olympic is a wholesale distributor of beverages that Constellation supplies in the
14   State of Washington.

15        24. Olympic's principal place of business is located in Puyallup, Washington.

16        25. Olympic is a limited liability company incorporated in the State of Missouri.

17        26. Olympic's members are citizens of Washington State.

18        27. Crown Imports LLC, doing business as Constellation Brands Beer Division, is a
19   wholesale supplier of beverages in Washington and other States.

20        28. Crown Imports LLC is a corporation incorporated in the State of Delaware.

21        29. Crown Imports LLC principal place of business is located in the State of Illinois.

22        30. The public information from the States of Illinois and Washington on the members
23   of Crown Imports LLC and their citizenship is attached as Exhibit D. On information and belief,
24   they are citizens of states different from Plaintiff.

25        31. Constellation Brands, Inc. is a corporation incorporated in the State of Delaware.

COMPLAINT FOR EQUITABLE RELIEF – 5

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

FG: 100643912.2

32. Constellation Brands, Inc. principal place of business is located in New York state.

33. Crown Imports LLC is a wholly-owned subsidiary of Constellation Brands, Inc. which is a publicly traded on the New York Stock Exchange.

34. Crown Imports LLC says its is doing business as Constellation Brands Beer Division.

35. Constellation Brands Beer Division is managed and controlled by Constellation Brands, Inc.

36. Crown Imports LLC and Constellation Brands, Inc. regularly transacts business in the State of Washington.

37. Crown Imports LLC and Constellation Brands, Inc. regularly transacts business in the Western District of Washington.

38. Crown Imports LLC registered agent in the State of Washington is C T Corporation System, 711 Capitol Way S., suite 204, Olympia, WA 98501-1267.

39. Constellation Brands, Inc. registered agent in the State of Washington is C T Corporation System, 711 Capitol Way S., suite 204, Olympia, WA 98501-1267

## III.    JURISDICTION AND VENUE

40. The plaintiff and defendant in this action are citizens of different states.

41. The value of the amount in controversy in this injunction action's claim for equitable relief exceeds $75,000.

42. This Court has original jurisdiction pursuant to 28 U.S.C. §1332.

43. The defendant corporation is subject to this Court's personal jurisdiction.

44. A substantial part of the events giving rise to plaintiff's claim in this action occurred in the Western District of Washington.

45. A substantial part of the plaintiff's property that is this subject of this action is located in the Western District of Washington.

46. Venue is proper in this Court pursuant to 28 U.S.C. §1391.

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

## IV.   FACTS

**A.   Distribution Agreement**

47. Constellation supplies beverages to Olympic pursuant to a written Distributor's Agreement.

48. Exhibit A to this Complaint is an accurate copy of the Distribution Agreement involved in this action for equitable relief and amendments to that agreement.

49. In this Complaint, the term "Distribution Agreement" means the agreement attached to this Complaint as Exhibit A.

50. The Distribution Agreement has a dollar value to Olympic of nearly $10 million per year in gross profits. It has other benefits to Olympic Eagle that cannot be easily measured.

51. Olympic signed the Distribution Agreement in 2003.

52. Olympic is in fact the distributor under the Distribution Agreement.

53. Barton Beers, LTD signed the Distribution Agreement in 2003.

54. Barton Beers, LTD was the original beverage supplier under the Distribution Agreement.

55. Crown Imports LLC is the successor of Barton Beers, LTD in the Distribution Agreement.

56. As of the date of this Complaint, defendant Constellation is the beverage supplier under the Distribution Agreement.

**B.   Beverages**

57. The beverages supplied to Olympic under the Distribution Agreement include the following brands:  Corona Extra, Corona Light, Corona Extra, Corona Familiar, Corona Premier, Modelo Chelada Especial, Modelo Chalada Tamarindo Picante, Modelo Especial, Modelo Negra, Pacifico Clara, Pacifico Ballena, and Victoria.

COMPLAINT FOR EQUITABLE RELIEF – 7

FG: 100643912.2

58. The beverages distributed by Olympic under the Distribution Agreement include the following brands: Corona Extra, Corona Light, Corona Extra, Corona Familiar, Corona Premier, Modelo Chelada Especial, Modelo Chalada Tamarindo Picante, Modelo Especial, Modelo Negra, Pacifico Clara, Pacifico Ballena, and Victoria.

59. In this Complaint, the term "Constellation Brands Beer" means the brands of beverages that Olympic distributes under the Distribution Agreement.

**C.  Performance**

60. Olympic has invested heavily in promoting Constellation Brands Beer.

61. Constellation has required Olympic to pay Constellation over $3 million in advertising fees under the Distribution Agreement.

62. Olympic has invested about $6 million to promote Constellation Brands Beer over the last 10 years.

63. Olympic has grown its sales of Constellation Brands Beer by an average of 8.9 % over the past 10 years.

64. Constellation Brands Beer represented about 70-80% of Olympic's profit growth in 2021-2022.

65. Constellation Brands Beer sales have been about 20% of Olympic's sales in 2021-2022.

66. Constellation Beer Brands represent Olympic's number 2 product line by sales volume.

67. Olympic has been given Constellation's award as a top distributor.

68. Exhibit B to this Complaint is an accurate copy of top distributor awards Constellation gave to Olympic.

COMPLAINT FOR EQUITABLE RELIEF – 8

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

FG: 100643912.2

1  **D.  <u>Termination</u>**

2      69. By letter dated September 8, 2022, Constellation notified Olympic that Constellation

3  is terminating the Distribution Agreement.

4      70. In this Complaint, the term "Constellation's termination notice" means the letter

5  dated September 8, 2022, notifying Olympic that Constellation is terminating the Distribution

6  Agreement.

7      71. Exhibit C to this Complaint is an accurate copy of Constellation's termination notice.

8      72. Constellation directed that Constellation's termination notice be physically delivered

9  to Olympic in the Western District of Washington.

10      73. Constellation's termination notice was in fact physically delivered to Olympic in the

11  Western District of Washington.

12      74. The witnesses to the delivery of Constellation's termination notice to Olympic, to the

13  impact of that termination notice on Olympic, and to the damages caused and threatened by that

14  termination notice are accordingly in the Western District of Washington.

15      75. Constellation's termination notice did not state any cause for terminating the

16  Distribution Agreement.

17      76. Washington law does not allow Constellation to terminate the Distribution

18  Agreement without cause.

19      77. Constellation's termination of the Distribution Agreement without cause violates

20  Washington law.

21      78. Olympic accordingly commences this equitable action for an injunction against

22  Constellation's terminating the Distribution Agreement without cause.

23

24

25

COMPLAINT FOR EQUITABLE RELIEF – 9

FG: 100643912.2

**E.**   **Purchase Offer**

79. Constellation's termination notice told Olympic that it had 60 days from September 8, 2022 to transfer Olympic's rights under the Distribution Agreement to another distributor, subject to Constellation's approval.

80. Without being contacted by Olympic, one competing distributor (Columbia Distributing) offered to pay Olympic seven times trailing 12 months earnings or about $70 million for Olympic's rights under the Distribution Agreement.

81. Columbia Distributing told Olympic that Columbia Distributing was Constellation's preferred buyer.

82.      Under Washington States Beer Wholesaler distributor law, any successor distributor is responsible to pay Olympic Eagle the "fair market value" of the distribution rights. RCW 19.126.040.   This remedy is non-exclusive of the distributor's other legal rights.

83. Three other Washington State distributors received a termination notice from Constellation in September 2022, two in Eastern and two in Western Washington.  Each has received just one offer for their rights.

84. King Beverages in Spokane received the same offer as Olympic Eagle--seven times 12 months trailing earnings--from Odom.  King Beverages called Columbia to see if it would make an offer and was told "not at this time."

85. Odom is also a competitor in Olympic Eagle's territory and would benefit from having the Constellation rights.  Olympic Eagle wrote to Odom and two other distributors who operate in its territory asking if they were interested in making an offer.   Odom responded that it is not interested in bidding for Olympic Eagle's Constellation distribution rights.

86. As part of Constellation's unlawful termination plan, and contrary to the public interest, Constellation had collaborated with Columbia Distributing and Odom, and maybe

COMPLAINT FOR EQUITABLE RELIEF – 10

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

FG: 100643912.2

1 others, to ensure that Olympic receives a lowball offer, not one that equals fair market value as

2 required by Washington law, for Olympics' rights under the Distribution Agreement.

3 **F.   <u>Termination Harm</u>**

4 87. Terminating Olympic's rights under the Distribution Agreement will immediately

5 make Olympic's business unprofitable.

6 88. In a presentation to the company's bankers, JP Morgan Chase, two weeks after the

7 termination, Olympic's CEO compared the financial impact of the termination to the crash of the

8 Hindenburg, the German ridged airship.

9 89. There are economies of scale in a distributor delivering liquid package products such

10 as cases of beer and soft drinks.

11 90. In light of these factors, terminating Olympic's rights under the Distribution

12 Agreement will seriously endanger Olympic's ability to stay in business.

13 91. There are efficiencies of scale in a beverage distributor delivering a wide range and

14 larger quantity of products to a store instead delivering a narrow range or smaller quantity of

15 products.

16 92. The cost of equipment, fuel and labor for any particular customer delivery does not

17 materially increase or decrease if the amount of beverage products.

18 93. Adding more beverage products to a customer delivery will generally make that stop

19 more profitable.

20 94. Reducing beverage products for a customer delivery will generally make that stop

21 less profitable.

22 95. In light of factors like the efficiencies of scale in delivering products to a store,

23 terminating Olympic's rights under the Distribution Agreement will increase Olympic's per unit

24 cost of distributing remaining products.

25

COMPLAINT FOR EQUITABLE RELIEF – 11

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

FG: 100643912.2

96. In light of factors like the efficiencies of scale in delivering products to a store, terminating Olympic's rights under the Distribution Agreement seriously endangers Olympic's ability to stay in business.

97. Olympic has more than 240 employees.

98. Many of Olympic's employees have worked for the company much of their entire careers.

99. Terminating Olympic's rights under the Distribution Agreement will cause a significant number of Olympic's employees to lose their job.

100. Terminating Olympic's rights under the Distribution Agreement will cause Olympic to lose customers to competitors.

101. In light of factors like customers lost to competitors from the termination of Olympic's rights under the Distribution Agreement, terminating Olympic's rights under the Distribution Agreement seriously endangers Olympic's ability to stay in business.

102. Terminating Olympic's rights under the Distribution Agreement will harm Olympic's ability to sell products other than Constellation Brands Beer since such termination leaves Olympic with fewer resources to market and merchandise products.

103. In light of factors like termination leaving Olympic with fewer resources to market and merchandise products, terminating Olympic's rights under the Distribution Agreement seriously endangers Olympic's ability to stay in business

104. Product positioning and placement on store shelves are very important to selling beverages in Olympic's beverage distribution industry.

105. Olympic will not be able to compete effectively for product positioning and placement on store shelves if Olympic's rights under the Distribution Agreement are terminated.

106. In light of these factors, Constellation's termination will make Olympic unable to compete effectively for product positioning and placement on store shelves.

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

FG: 100643912.2

107.     Olympic has established customer good will from distributing Constellation Beer Brands.

108.     Constellation's termination will cause Olympic to lose customer good will.

**G.   Constellation Has No Right To Terminate Without Cause**

109.     Some distribution agreements between a supplier and distributor have a provision stating clearly and explicitly that the supplier can terminate the distribution agreement without cause.

110.     The Distribution Agreement in this case does not have a provision stating that the supplier can terminate the agreement without cause.

111.     Olympic did not draft the Distribution Agreement.

112.     The Distribution Agreement was drafted by the supplier in that agreement.

113.     The Distribution Agreement says "certain provisions" "may conflict with the laws of certain states." ¶ 12.1

114.     It says that "[r]ather than attempting to conform this Agreement to the laws of each state, the parties intend that all of the terms and provisions of this Agreement are made subject to all applicable federal, state and local laws, and in the performance of this Agreement both parties shall comply with such laws." ¶ 12.1.

**1.   The Washington Franchise Investment Protection Act (FIPA) Prohibits Termination Without Cause.**

115.     The Washington Franchise Investment Protection Act ("FIPA"), RCW 19.100.180, prohibits a supplier such as Constellation from terminating a distributor such as Olympic <u>without</u> cause before the end of the term that is stated in the distribution agreement.

116.     Olympic Eagle is entitled to protection under FIPA because its relationship with Constellation meets the definition of "franchise" under RCW 19.100.010(6).

COMPLAINT FOR EQUITABLE RELIEF – 13

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

FG: 100643912.2

117.    The Distribution Agreement grants Olympic the right to distribute goods under a "marketing plan" prescribed or suggested in substantial part by Constellation or its affiliate. Olympic was required to operate under annual business plans and marketing plans required or suggested by Constellation that included required marketing activities and investments, discount pricing programs, training, point of sales material, and operations and financial controls

118.    Olympics' distribution of Constellation products is "substantially associated" with Constellation's trademarks, service marks, trade name and advertising as it was required to advertise and promote Constellation products in addition to delivering them.

119.    Olympic Eagle paid a "franchise fee" to Constellation. It was required to pay of a national marketing fee assessed at the rate that varied but in recent years equaled $0.34 per case.  Olympic paid more than $3 million in such franchise fees over the past 10 years.

120.    Crown Imports LLC and Constellation Brands, Inc. should be enjoined from violating any provision of RCW 19.100.180, including without limitation: failing to deal in good faith; discriminating against Olympic in any business dealing with  franchisees without making the required showings of the statute; requiring a release or waiver of liability; imposing a standard of conduct in an agreement unless meeting the burden to show it is reasonable and necessary; or terminating the distributor agreement without cause prior to the end of its term.

121.    The Washington Legislature has declared a violation of FIPA's franchisee "bill of rights," RCW 19.100.180, "shall constitute an unfair or deceptive act or practice" under RCW 19.86, the state's Consumer Protection Act.  RCW 19.100.190.

122.    Olympic may bring an action for an injunction under RCW 19.86.090 to enjoin a violation of RCW 19.100.180 and to recover the costs of the suit, including a reasonable attorney's fee.

   2.   **The Agreement Does Not Allow Termination Without Cause.**

123.    The Distribution Agreement does not have a termination date.

COMPLAINT FOR EQUITABLE RELIEF – 14

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

FG: 100643912.2

124.   The Distribution Agreement does not have a provision allowing one party to amend the Distribution Agreement without the written agreement of the other party.

125.   Some State statutes grant the supplier the right to terminate a distribution agreement without cause.

126.   This court (the U.S. District Court for the Western District of Washington) has held the <u>Colorado</u> statute applicable to distribution agreements like the Distribution Agreement in this case grants the supplier the right to terminate the distribution agreement without cause. *Odom Corporation v. Pabst Brewing Company, LLC*, 2017 WL 2313491 (W.D.Wash 2017) at *3; *Marine View Beverage, Inc. v. Pabst Brewing Company, LLC*, 2017 WL 2313490 (W.D.Wash 2017) at *3 (same).

127.   Constellation knows or should know that this court (the U.S. District Court for the Western District of Washington) has held that the Colorado statute applicable to distribution agreements like the Distribution Agreement in this case grants the supplier the right to terminate the distribution agreement without cause.

128.   The State of Washington does not have a statute granting the supplier the right to terminate a distributor without cause.

129.   This court (the U.S. District Court for the Western District of Washington) has held the <u>Washington</u> statute applicable to distribution agreements like the Distribution Agreement in this case does <u>not</u> grant the supplier the right to terminate the distribution agreement without cause. *Odom Corporation v. Pabst Brewing Company, LLC*, 2017 WL 2313491 (W.D.Wash 2017) at *3 (noting the contrasting language in Colorado's statute, and holding "Because Washington's Wholesale Distributors and Suppliers Act does not include such or similar language, it does not grant suppliers permission to terminate a distributor's rights without cause." *Marine View Beverage, Inc. v. Pabst Brewing Company, LLC*, 2017 WL 2313490 (W.D.Wash 2017) at *3 (same).

COMPLAINT FOR EQUITABLE RELIEF – 15

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

130.     Constellation knows or should know that this court (the U.S. District Court for the Western District of Washington) has held that the Washington statute applicable to distribution agreements like the Distribution Agreement in this case does not grant the supplier the right to terminate the distribution agreement without cause.

131.     Constellation knows or should know that there is no Washington statute or law that grants Constellation the right to terminate a distributor without cause.

## V.     CLAIM FOR EQUITABLE RELIEF

### A.    *Immediate* Equitable Relief:  Preliminary Injunction

132.     Olympic incorporates all allegations in this Complaint not inconsistent with this Complaint's request for a preliminary injunction.

133.     Olympic is entitled to a preliminary injunction against Constellation's terminating the Distribution Agreement without cause or otherwise violating Olympic's rights under Washington law in this matter.

134.     Olympic is likely to succeed on the merits of its permanent injunction claim.  For example, for reasons elsewhere noted in this Complaint, it is at least likely that Constellation does not have the right to terminate the Distribution Agreement without cause.

135.     Olympic is likely to suffer irreparable harm in the absence of preliminary relief.  For example, for reasons elsewhere noted in this Complaint, Constellation's terminating the Distribution Agreement without cause will likely cause Olympic to be unprofitable which might put it out of business, cause dozens of Olympic employees to lose their jobs, and irretrievably damage Olympic's name, reputation and goodwill with its customers.

136.      The balance of equities tips in Olympic's favor.  For example: on one hand (and as elsewhere noted in this Complaint), Constellation does not have the right to terminate the Distribution Agreement without cause, and on the other hand (and as elsewhere noted in this Complaint), Constellation's terminating the Distribution Agreement without cause seriously

COMPLAINT FOR EQUITABLE RELIEF – 16

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

FG: 100643912.2

1   endangers Olympic's ability to stay in business, endangers the livelihood of the dozens of

2   Olympic employees (and their families) by causing those employees to lose their jobs, and

3   irretrievably damages Olympic's name and reputation.

4       137.    Granting an injunction against Constellation's terminating the Distribution

5   Agreement without cause is in the public interest.  For example, as noted elsewhere in this

6   Complaint, Constellation's terminating the Distribution Agreement without cause is not lawful

7   under Washington law, seriously endangers Olympic's ability to stay in business, endangers the

8   livelihood of the dozens of Olympic employees (and their families) by causing those employees

9   to lose their jobs, and irretrievably damages Olympic's name and reputation.

10      138.    Olympic is entitled to the preliminary injunction it seeks in this Complaint.

11      139.    Olympic is also entitled to a preliminary injunction if (1) Olympic shows there

12  are at least <u>serious questions</u> going to the merits of its permanent injunction claim; (2) Olympic

13  is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities

14  <u>tips sharply</u> in Olympic's favor; and (4) an injunction is in the public interest.  *Alliance for the*

15  *Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (describing this test as "the 'sliding

16  scale' variant of the *Winter* standard").

17      140.    At the very least, there are serious questions going to the merits Olympic's

18  permanent injunction claim.  For example, for reasons elsewhere noted in this Complaint, there

19  are at least serious questions under Washington law as to whether Constellation has the right to

20  terminate the Distribution Agreement without cause.

21      141.    As noted elsewhere in this Complaint, Olympic is likely to suffer irreparable harm

22  in the absence of preliminary relief.

23      142.    The balance of equities tips sharply in Olympic's favor.  For example, as noted

24  earlier: on Constellation's side of the equity scale, Constellation does not have the right under

25  Washington law to terminate the Distribution Agreement without cause – while on the other side

COMPLAINT FOR EQUITABLE RELIEF – 17

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

FG: 100643912.2

1   of the equity scale, Constellation's terminating the Distribution Agreement without cause

2   seriously endangers Olympic's ability to stay in business, endangers the livelihood of the dozens

3   of Olympic employees (and their families) by causing those employees to lose their jobs,

4   irretrievably damages Olympic's name, reputation, and good will and violates Washington law's

5   prohibition against Constellation's terminating a distributor like Olympic without cause.

6        143.   As noted elsewhere in this Complaint, granting an injunction against

7   Constellation's terminating the Distribution Agreement without cause is in the public interest.

8        144.   Olympic is entitled to the preliminary injunction it seeks in this Complaint under

9   the *Wild Rockies/Winter* preliminary injunction test noted above.

10  ***Continuing*** **Equitable Relief:  Permanent Injunction**

11       145.   Olympic incorporates all allegations in this Complaint not inconsistent with this

12  Complaint's request for a permanent injunction.

13       146.   Olympic is entitled to a <u>permanent</u> injunction against Constellation's terminating

14  the Distribution Agreement without cause or otherwise violating Olympic's rights under

15  Washington law in this matter.

16       147.   Olympic is entitled to the permanent injunction it seeks if (1) Olympic will suffer

17  an irreparable injury from Constellation's termination of the Distribution Agreement;

18  (2) remedies available at law, such as monetary damages, are inadequate to compensate for that

19  injury; (3) a remedy in equity is warranted considering the balance of hardships between

20  Olympic and Constellation; and (4) the public interest would not be disserved by a permanent

21  injunction.

22       148.   As noted elsewhere in this Complaint, Olympic will suffer irreparable harm and

23  injury from Constellation's termination of the Distribution Agreement absent an injunction.

24

25

COMPLAINT FOR EQUITABLE RELIEF – 18

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

FG: 100643912.2

149.    Remedies available at law, such as monetary damages, are inadequate to compensate for the irreparable harm and injury noted in this Complaint that would be caused by Constellation's termination of the Distribution Agreement.

150.    The requested injunction remedy in equity is warranted considering the balance of hardships between Olympic and Constellation.  The balance of hardships favoring the requested injunction are, for example, illustrated by the balance of equities noted elsewhere in this Complaint.

151.    The public interest would not be disserved by a permanent injunction.  For reasons noted elsewhere in this Complaint, granting the requested injunction against Constellation's terminating the Distribution Agreement without cause instead serves the public interest.

152.    Olympic is entitled to the permanent injunction it seeks in this Complaint under the applicable permanent injunction test.

## PRAYER FOR RELIEF

Olympic respectfully requests that the Court grant the following equitable relief:

1.  A <u>preliminary</u> injunction against Constellation's terminating the Distribution Agreement without cause or otherwise violating Olympic's rights under Washington law in this matter.

2.  A <u>permanent</u> injunction against Constellation's terminating the Distribution Agreement without cause or otherwise violating Olympic's rights under Washington law in this matter.

3.  An express directive in the Court's injunction orders that they apply to defendants' officers, directors, partners, agents, affiliates, members, and employees, as well as to all persons acting or claiming to act on their behalf or in concert with them;

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

FG: 100643912.2

4.  Such other equitable relief that the Court deems just and proper, including (but not limited to) an equitable award of Olympic's costs and attorney fees.


RESPECTFULLY SUBMITTED this 6th day of October, 2022.

FOSTER GARVEY PC

*/s/ Michael Vaska*
Michael Vaska, WSBA #15438
Thomas Ahearne, WSBA # 14844
Ben Hodges, WSBA # 49301
Angelo Marchesini, WSBA # 57051
1111 Third Avenue, Suite 3000
Seattle, Washington 98101
Telephone: (206) 447-4400
Facsimile: (206) 447-9700
Email:  michael.vaska@foster.com

*Attorneys for Plaintiff City Beverages L.L.C., d/b/a Olympic Eagle Distributing*


## CERTIFICATE OF SERVICE

I certify that on October 6, 2022, I electronically filed the foregoing document with the Clerk of the Court via CM/ECF which will notify all parties in this matter who are registered with the Court's CM/ECF filing system of such filing. All other parties (if any) shall be served in accordance with the Federal Rules of Civil Procedure.

DATED this 6th day of October 2022.

*s/Keri Newman*
Keri Newman

COMPLAINT FOR EQUITABLE RELIEF – 20

FG: 100643912.2

EXHIBIT A TO COMPLAINT FOR EQUITABLE RELIEF

Barton Agreement

### *BARTON BEERS, LTD.*
### *DISTRIBUTOR'S AGREEMENT*

THIS AGREEMENT, made and entered into effective as of October 22, 2003, by and between **CITY BEVERAGES, LLC.**, located in Lakewood, Washington (hereinafter called "Distributor"), and **BARTON BEERS, LTD.**, a Maryland corporation (hereinafter called "Barton").

### **WITNESSETH:**

**WHEREAS,** Distributor is duly licensed to sell at wholesale alcoholic beverages in the State of Washington, and is the holder of all federal, state and local permits necessary for such purposes; and

**WHEREAS,** Distributor is desirous of becoming a wholesale distributor of Barton products in the State of Washington, as more specifically described below:

**NOW, THEREFORE,** it is mutually agreed as follows:

1. **APPOINTMENT**

    1.1    Barton hereby appoints Distributor as its exclusive distributor of the alcoholic beverages listed in Exhibit I hereto (hereinafter called the "Subject Beverages"), with responsibility for the wholesaling of the Subject Beverages only within the geographical areas described in Exhibit II hereto (hereinafter called the "Territory"), excluding export, airline and ships chandlers sales.    Notwithstanding the foregoing, any legal dual territory appointments in existence in the Territory on the effective date of this Agreement shall remain in existence at Barton's sole discretion.    Except for such existing dual appointments and except as indicated in Section 1.3 below, Barton will not grant to any other distributor the right to sell the Subject Beverages in the Territory.

    1.2    Distributor shall not sell, deliver or transfer any Subject Beverages to any retail account outside the Territory or to any person Distributor knows or has reason to believe will sell or transfer any of the Subject Beverages outside the Territory.    Notwithstanding the foregoing and where permitted by law, Distributor may, with the prior written approval of Barton, sell one or more Subject Beverages outside the Territory to the extent and so long as Barton shall authorize.    If Distributor fails to comply with the provisions of this Section 1.2, Barton shall have the right to terminate this Agreement in accordance with the procedures described in Section 6.3 of this Agreement.  Nothing in this Section shall prevent Distributor from selling or supplying the Subject Beverages to another authorized Barton distributor for the purpose of eliminating product shortages or inventory imbalances.

    1.3    Notwithstanding the provisions of Section 1.1, Barton may, after giving notice to Distributor, permit another person or persons to sell the Subject Beverages within the Territory to the extent and so long as Distributor is unable or unwilling to provide uninterrupted service to accounts within all or any part of the Territory (other than by reason of retailer credit issues) and any necessary approval has been obtained from the appropriate state regulatory authorities;  provided, however, that Barton shall not exercise its rights under this Section if Distributor has notified its Barton Division Manager in writing of any reasons (other than retailer credit issues) for failing to service such account(s) and the Division Manager has approved such reasons, which approval shall not be unreasonably withheld.    Nothing in this Section 1.3 shall in any way limit or restrict Barton's rights under Article 6 of this Agreement.

1.4    Distributor may not assign subdistributors to sell and or/distribute the Subject Beverages within the Territory except when necessary to ensure full sales and marketing coverage of the Territory and only with the prior written consent of Barton. Distributor agrees to inform Barton, prior to execution of this Agreement, of any existing sub-distributors in the Territory and to obtain Barton's written consent thereto. Distributor shall be fully responsible and accountable to Barton for the supervision and performance of any subdistributors in the Territory, and shall enforce Barton's quality and operations policies against any subdistributors. Barton shall have no liability for the non-renewal or termination of any subdistributors, and Distributor agrees to defend and hold Barton harmless from and against all actions or claims that may be brought by any subdistributors assigned by Distributor.

1.5    Insofar as any of the Subject Beverages include products ("Products") which are supplied to Barton by a third party (the "Third Party"), then this Agreement and any agreement made by Distributor with subdistributors relating to any such Products shall be subject to the agreement between Barton and the relevant Third Party (including but not limited to provisions relating to quality control, package specifications and discontinuance of a brand) as the same may be amended from time to time.

2.    **TERM**

2.1    The term of this Agreement shall commence on October 22, 2003 and shall continue until terminated or amended and restated as herein provided.

2.2    Anything herein to the contrary notwithstanding, this Agreement shall automatically terminate with respect to any Subject Beverage concurrently with the termination of Barton's appointment as the importer/supplier of any such Subject Beverage, whether by agreement by Barton or otherwise. Barton shall not be liable to Distributor for any damages resulting from the termination of this Agreement as aforesaid.

2.3    This Agreement may be amended and restated in whole as follows: (a) Barton will submit the proposed amendment to Distributor concurrently with the submission of such amendment to all other Barton distributors in the United States that have signed a distributor's agreement in substantially similar form, provided that variations in the form of the amendment may be made as necessary to comply with state law; and (b) Distributor shall indicate its acceptance of the amendment by signing and returning it to Barton within sixty (60) days of Distributor's receipt of the amendment, and if Barton has not received such signed amendment within 60 days then the parties shall follow the expedited dispute resolution procedure set forth in Section 11 in order to resolve the outstanding issues preventing execution of the amendment. If such issues have not been resolved within 60 days of the commencement of such expedited dispute resolution process, then the parties shall continue operating under the terms and conditions of this Agreement.

3.    **DUTIES OF DISTRIBUTOR**

3.1.    General. Distributor accepts the appointment aforesaid and agrees to sell and distribute the Subject Beverages within the Territory so long as this Agreement remains in effect. Distributor shall throughout the life of this Agreement exert its best efforts to supply and serve in the Territory as extensive a market for the Subject Beverages as possible.

3.2    Proper Licensing. Distributor shall sell the Subject Beverages only to retailers and other persons to whom Distributor is duly licensed to sell such products. Distributor shall comply with all valid laws, regulations, ordinances and orders, including those applicable to the sale of the Subject Beverages, Distributor's performance under this Agreement and

the conduct of Distributor's business.  Distributor shall maintain all permits and licenses necessary to sell and distribute the Subject Beverages in the Territory, and shall, if requested by Barton, provide copies of all such permits and licenses, as the same may be amended or renewed.

3.3     <u>Performance Standards</u>.  Distributor shall use its best efforts to comply at all times with the performance standards set forth in the Barton Wholesaler Standards Manual (the "Manual"), receipt of which is hereby acknowledged. Barton may, from time to time, make reasonable changes to the Manual, with notice to Distributor, and any such modification shall not be deemed an amendment to this Agreement.  Should any terms or conditions as to Distributor's obligations contained in this Agreement conflict with those contained in the Manual, then the terms and conditions contained in this Agreement shall prevail.   The performance standards to be achieved by Distributor include, but are not limited to, the following:

   (a)     <u>Sales</u>.  Distributor shall, if required under the Sales Standards contained in the Manual, prepare and submit to Barton an annual business plan in form and content acceptable to Barton (the "Business Plan"), which shall include reasonable sales, volume, distribution and financial goals, retail service policies, tel-sell policies, sales and merchandising execution standards, point of sale plans and management and succession plans.  The Business Plan shall be subject to Barton's review and written approval, and shall be completed and ready to implement no later than December 31 of each calendar year.  In the event that Distributor does not submit its Business Plan by the due date, as set forth in the Manual, or if the submitted Business Plan is not acceptable to Barton, then the parties shall attempt to resolve any outstanding issues through the expedited dispute resolution procedure set forth in Section 11 hereof.  If Distributor and Barton cannot agree on a Business Plan using the expedited dispute resolution procedure by February 28 of any year, then  (i) Distributor's case sales goal for such year shall be deemed to be the greater of (A) the prior year's actual depletions plus 50% of the prior year's actual growth trend, or (B) the actual depletions for the prior year, and (ii) Distributor's distribution goals shall be deemed to be the average distribution level for the prior year by brand and package within Distributor's state or Barton region (as designated by Barton).   Distributor shall meet or exceed the goals established in the Business Plan, and shall consult with Barton as necessary to make adjustments to the Business Plan throughout the year.

   (b)     <u>Operations</u>.  Distributor shall: (i) forecast and order Subject Beverages in accordance with Barton's current procedures; (ii) comply with Barton's inventory management policies; (iii) maintain an adequate and clean place of business in the Territory; and (iv) properly handle and protect from damage all Subject Beverages and property owned by Barton, all in accordance with the procedures set forth in the Manual.

   (c)     <u>Quality</u>. Distributor shall: (i) comply with Barton's stock rotation procedures for the Subject Beverages in its warehouse, on its trucks and, to the extent permitted by law, in retail accounts; (ii) prevent Subject Beverages bearing expired code dates from reaching retailers or consumers;  (iii) retrieve any overage Subject Beverages from retail locations and replace them with nonoverage Subject Beverages at no cost to the retailer; and (iv) promptly destroy any overage Subject Beverages at no cost to Barton, all in accordance with the procedures set forth in the Manual.

(d)     Finance.  Distributor shall: (i) maintain sufficient working capital to ensure that its facilities, equipment, inventory and personnel are adequate to compete effectively with other non-Barton malt beverages; (ii) purchase and maintain sufficient insurance coverage; (iii) pay all federal, state and local taxes imposed on it; and (iv) maintain a positive tangible net worth.   Distributor shall furnish to Barton annually within one hundred and twenty (120) days after Distributor's fiscal year end financial statements prepared in compliance with generally accepted accounting principles applied on a consistent basis, and audited by an independent accountant or attested to by the chief financial officer of Distributor.

3.4     Barton-Dedicated Personnel/Resources.   If Distributor's annual case volume of Subject Beverages is 250,000 or greater, then Distributor shall designate, with Barton's approval, an employee who will be known as the "Barton Brand Manager ("BBM"), who will be responsible for promoting the relationship with Barton within Distributor's organization and overseeing Distributor's compliance with this Agreement and the Manual.   The BBM will report to Distributor's General Manager, VP of Sales or equivalent officer.   The BBM will act as the primary liaison between Barton and Distributor and have day to day operating supervision and control over sales and marketing of the Subject Beverages, including but not limited to delivering, selling, servicing, advertising, marketing, merchandising, promotion and control over the tactical spending budget, as more specifically set forth in the Manual.  The BBM shall spend a percentage of his or her time attending to BBM duties that is proportionate to Distributor's case volume of Subject Beverages, as more specifically set forth in the Manual.  Distributors with an annual case volume of 1,000,000 or more may, in lieu of employing a full-time BBM, make a written proposal to allocate equivalent resources towards the sale and servicing of the Subject Beverages, subject to the written approval of Distributor's Barton Division Manager, all as more fully set forth in the Manual.  The BBM may have other duties within Distributor's organization so long as such person shall devote his or her time to the needs of the Subject Beverages at the level appropriate to achieve the objectives set forth in the Business Plan and the Manual.  If the objectives in the Business Plan for any year are not met, Barton may, at its option, either (a) recommend that the BBM  dedicate 100% of his or her time to the needs of the Subject Beverages, or (b) recommend appointment of a different person to act as Barton Brand Manager, subject to Barton's approval, and Distributor shall not unreasonably withhold or delay its consent to such recommendations.   So long as Distributor meets the case volume requirement listed above, then Distributor shall at all times have on staff an employee who acts as the BBM.   Distributor shall inform Barton within 48 hours of any change in the BBM.   If the BBM is terminated, or Barton withdraws its approval of the BBM, Distributor will nominate a successor BBM for Barton's approval within 30 days of such event.  The BBM shall at all times be employed by Distributor, and nothing in this Section 3.4 shall cause the BBM to be an employee of Barton.

3.5     Brand Treatment.   Distributor agrees to vigorously promote the Subject Beverages by (a) applying all necessary financial and operation resources to achieve or exceed the goals set forth in the Business Plan, (b) devoting sales efforts and financial resources to the Subject Beverages which, when compared to sales efforts and financial resources dedicated to all malt beverage products sold by Distributor, are proportionate to the contribution made by the Subject Beverages to Distributor's total gross profit, (c) compensating employees for Subject Beverages sold in an amount which is equal to or higher than the highest employee compensation (sales commissions and bonus), on a per case or percentage profit basis, as applicable, paid by Distributor for sales of any malt beverage brands carried by Distributor, (d) participating in, including contributing to the cost of, media (so long as all other distributors in Distributor's media coverage area are required to participate), sales incentive and promotional programs designed to benefit sales and distribution of the

Subject Beverages in the Territory, and carrying out Barton's sales, advertising and marketing policies and programs that are in effect from time to time, (e) distributing of point-of-sale materials and maintaining and storing such materials in Distributor's warehouse in accordance with the policies set forth in the Manual, and (f) establishing and utilizing a sales, delivery and service call frequency program for the Subject Beverages that is competitive with or better than that of the leading malt beverage wholesaler in the Territory (which information shall be provided by Barton if it is otherwise unavailable to Distributor), and maintaining accurate records of such calls for consultation with Barton sales personnel.

3.6     Reports and Submissions to Barton.   Distributor shall submit only complete and accurate notices, reports, claims, reimbursement requests, payment requests or other communications to Barton.   Distributor agrees to furnish (a) monthly electronic reports, using a system acceptable to Barton, to Barton or its designated agent showing depletions of inventory of each of the Subject Beverages during the preceding month and the inventory of the same at the end of the month, (b) weekly electronic reports, using a system acceptable to Barton, at the retail account level, categorized by channel, of sales, distribution, pricing and any other relevant information requested by Barton, and (c) such other information as may be required pursuant to the Manual, including, if and when requested by Barton, daily electronic reports of depletions, pricing and sales information. Records of all transactions, including price promotions, shall be maintained by Distributor for a minimum of three (3) years or as prescribed by state law, whichever is longer. Barton shall have the right to audit all such records at reasonable times at the location where such records are kept, or at such other location as the parties may mutually agree.

## 4.     TERMS OF SALE

4.1     The price per case or case equivalent at which Barton shall sell the various Subject Beverages to the Distributor and at which Distributor shall buy from Barton shall be the prices specified by Barton from time to time for a particular brand of merchandise.

4.2     Distributor's receipt of any shipment of Subject Beverages shall be an unqualified acceptance of, and a waiver by Distributor of any claims with respect to, such Subject Beverages unless Distributor gives Barton notice of claims within seventy-two hours after receipt, as more specifically set forth in the Manual.

4.3     In order to implement the price reductions and other promotional activity customary in the industry and necessary to compete with other brands of malt beverages, Barton reserves the right to designate certain reductions in its price to Distributor, including FOB reductions, as "Promotional Reductions."   As part of its obligation to exercise best efforts in selling the Subject Beverages, Barton expects that Distributor shall use Promotional Reductions for competitive purposes in the Territory.   Barton reserves the right to monitor Distributor's use of Promotional Reductions, including monitoring Distributor's resale price for the Subject Beverages.   If Distributor's price to retailers during any period during which Barton offers a Promotional Reduction does not reflect such Promotional Reduction or any recommended matching reduction from Distributor, then Barton may, in its sole discretion, either (a) invoice Distributor for an additional contribution to media and promotional programs pursuant to Section 3.5(d) hereof, or (b) reduce the amount of promotional credits granted to Distributor during any promotional period, but only to the extent that such Promotional Reduction was not fully passed along to retailers.

4.4     Barton reserves the right to modify or discontinue the sale of any Subject Beverage, package or container on a national, regional, state or other basis.

4.5     Distributor must order the Subject Beverages from Barton in accordance with the Operations Standards set forth in the Manual and Barton's Supply Chain Process Manual (the "Supply Chain Manual"), and Barton will make every effort to fill Distributor's orders within a reasonable time period. Barton in its sole discretion may approve or disapprove Distributor's orders. The Subject Beverages may be shipped to Distributor from locations designated by Barton from time to time. On any shipment of Subject Beverages to Distributor, title and risk of loss will pass to Distributor as set forth in the invoice for the Subject Beverages.

4.6     Barton shall have the right to place Distributor on equitable allocation, as determined by Barton, when the supply of any Subject Beverage is insufficient to meet demands of all distributors. Barton shall not be liable to Distributor for failure to make any delivery to Distributor or delay in any delivery if caused by lack of supply or by any circumstances beyond the reasonable control of Barton. Distributor agrees not to cancel any orders by reason of receiving a partial shipment as a result of Barton's pursuit of any allocation method from time to time.

4.7     The amount of credit, if any, extended to Distributor, and the terms of payment for the products sold to Distributor by Barton, shall be determined by Barton from time to time in its sole discretion. The terms stipulated by Barton on each invoice covering products sold to Distributor shall represent the terms of payment with respect to each individual shipment and shall be of the essence of this Agreement. Irrespective of any designation by Distributor, Barton may, in its sole discretion, apply, offset, reapply or transfer any payments made by or credit due Distributor against the oldest item of account of indebtedness owed to Barton. Distributor agrees to make invoice payments to Barton using the PACE (EFT) System, as more fully described in the Manual. Regardless of the method of payment, Distributor hereby grants, and Barton shall retain, a continuing security interest in all Subject Beverages delivered to Distributor until Barton's receipt of full payment of all monies owed to Barton and termination of this Agreement. Distributor shall cooperate with Barton in completing any documentation or taking any actions necessary to perfect such security interest.

4.8     Distributor shall notify Barton at least 10 days prior to any change in Distributor's bank or financial institution.

5.      **CHANGES IN OWNERSHIP OR MANAGEMENT OF DISTRIBUTOR**

5.1     Distributor agrees to notify Barton in writing 30 days prior to any of the following:

(a)     A change of 20% or more in the ownership of Distributor, or any change in the designated successor, principal(s) or general manager of Distributor, regardless of the manner in which such change is brought about;

(b)     Any change in the form of business entity of Distributor;

(c)     Any agreement to sell, transfer, assign or otherwise dispose of (i) Distributor's right to distribute the Subject Beverages, or (ii) any other property comprising 20% or more of Distributor's assets, other than in the ordinary course of business; or

(d)     Any appointment by Distributor of one or more sub-distributors to service all or any part of the Territory for the Subject Beverages.

5.2     Barton's written consent is required for any of the Distributor changes set forth in Section 5.1 except for 5.1(b); provided, however, that any Section 5.1(b) change shall be subject to Barton's right to modify its credit arrangements with Distributor as necessary.  Barton shall have the right, within sixty (60) days after its receipt of any such written notice (which notice shall detail the background and/or structure of the new owner, manager, Distributor form of business entity, recipient of Distributor's assets, or sub-distributor), and all reasonably requested information from Distributor, all as more specifically set forth in the Manual, to approve or disapprove the change.

5.3     In deciding whether to grant its consent to any Distributor change, Barton may consider all business, financial, industry and other factors which it reasonably deems relevant, including but not limited to:

        (a)     the alignment of the Territory with the territories of other Barton distributors in the state or region, both before and after the proposed change;

        (b)     the effect of the proposed change on competition in the Territory and on Distributor's continuing ability to make independent business judgments;

        (c)     whether the proposed acquirer distributes other brands of malt beverages or other non-Barton products in the Territory, and whether, in Barton's reasonable judgment, the combined brand portfolio of Distributor after the proposed change could pose a conflict of interest or policies which could adversely affect Distributor's sale and promotion of the Subject Beverages;

        (d)     whether the proposed acquirer is currently a distributor of Barton products in another territory;

        (e)     whether, after the proposed change, Distributor and/or the proposed acquirer will have the financial resources, business experience and level of interest in the Subject Beverages required to perform this Agreement; and

        (f)     whether the proposed acquirer is willing to sell Barton's entire portfolio of brands or, if the Subject Beverages do not include the entire Barton portfolio of brands, whether the proposed acquirer is willing to distribute the brands not included in the Subject Beverages should such brands become available.

5.4     Distributor may acquire the rights to sell other brands of beer or other beverages in the Territory without Barton's consent, but any such acquisition shall not reduce Distributor's obligation to Barton.   At least 30 days prior to the closing of an acquisition relating to other brands or products, which acquired brands or products are likely to result in Distributor revenues from the sale of beer or other beverages increasing by 20% or more from Distributor's prior year revenues, Distributor shall provide Barton with information and assurances for performance in efforts, resources and manpower such that there will be no dilution of efforts as to the Subject Beverages.

5.5     Upon receipt of written notice from Distributor pursuant to 5.1(c) that Distributor intends to sell or otherwise transfer its rights to distribute the Subject Beverages to a third party (a "Transfer Notice"), Barton shall have the right to negotiate exclusively with Distributor to purchase the rights to distribute the Subject Beverages.  Barton shall notify Distributor in writing of its intent to negotiate for the purchase of the distribution rights within 30 days of Barton's receipt of the Transfer Notice from Distributor.  If Barton elects not to so negotiate, or if Barton fails within such 30-day period to notify Distributor of its intent to negotiate, then Barton's right to negotiate exclusively shall be deemed waived.

Distributor and Barton shall negotiate exclusively and in good faith for 60 days, commencing upon Distributor's receipt of Barton's election to negotiate. If such negotiations result in an agreement between Distributor and Barton, the parties shall promptly consummate closing of the transaction pursuant to such agreement. If Barton and Distributor fail to reach an agreement to purchase within such 60 day period, or if Barton waives its right to negotiate, then Distributor may proceed to negotiate with a third party, provided, however, that if Distributor reaches an agreement with such third party that is (a) for a purchase price less than or equal to any price previously offered by Barton, or (ii) for a sale transaction substantially different, either in form or as to the extent of Distributor's business being sold, than the previously contemplated transaction, then Barton's purchase option will be re-activated. If Barton does not exercise this option, then Distributor may sell to the third party pending approval by Barton.

5.6     If Barton disapproves any Distributor change set forth in Section 5.1 and Distributor nevertheless elects to proceed with the change, then Barton, at its sole option, may terminate this Agreement within 30 days of the change and on the effective date of termination Barton will pay to Distributor, in full and complete satisfaction, waiver and discharge of all claims of whatever nature that Distributor may have against Barton and its affiliates, arising out of or with respect to the termination, as liquidated damages and reasonable compensation as a result of the termination, and not as a penalty, a sum equal to Distributor's Net Effective Profit attributable to the sale of the Subject Beverages to retailers in its Territory for the most recent 12-month period. "Net Effective Profit" means gross profit from sales of the Subject Beverages net of trade discounts or allowances, calculated in accordance with GAAP, actually incurred by Barton or wholesaler.   All credits and debits incurred in the normal course of business up to the date of termination will be settled between Barton and Distributor.   These include promotional allowances resulting from authorized programs, outstanding pre-approved credits, deposits on kegs and pallets, etc. These amounts will be treated separately from the above "Net Effective Profit" calculation.

## 6.     **TERMINATION OF AGREEMENT**

6.1     This Agreement may be terminated at any time by mutual agreement of the parties or by Distributor upon 90 days' prior written notice to Barton.   Barton may, upon receipt of a termination notice from Distributor, seek alternative distribution arrangements for the Subject Beverages, and upon securing such alternative arrangements Barton may accelerate the date of termination by providing written notice to Distributor.

6.2     The parties agree that due to the built-in uncertainties in the market for the Subject Beverages, including the valuation of good will, Distributor's profit margins and certain other factors, it would be difficult to determine the actual damages, if any that may result from Barton's termination of this Agreement. Accordingly, in the event of the termination of this Agreement by Barton without cause, Barton shall give Distributor 30 days written notice of its intent to terminate on this basis, and Distributor during such 30 day period Distributor may transfer its rights to distribute the Subject Beverages to another distributor, subject to Barton's approval.   If, at the end of such 30 day period, Distributor has not transferred its distribution rights to another distributor approved by Barton, then Barton shall pay to Distributor in full and complete satisfaction, waiver and discharge of all claims of whatever nature that Distributor may have against Barton and its affiliates, arising out of or with respect to the termination, as liquidated damages and not a penalty, a sum equal to (a) two times Distributor's Net Effective Profit (as defined in Section 5.6 above) attributable to the sale of the Subject Beverages that are Modelo brands to retailers in Distributor's territory for the most recent 12-month period, plus (b) Distributor's Net Effective Profit attributable to the sale of the Subject Beverages other than the Modelo

brands to retailers in Distributor's territory for the most recent 12-month period.    All credits and debits incurred in the normal course of business up to the date of termination will be settled between Barton and Distributor.    These include promotional allowances resulting from authorized programs, outstanding pre-approved credits, deposits on kegs and pallets, etc.  These amounts will be treated separately from the Net Effective Profit calculation.    These payments shall be in addition to any amounts payable for inventories under Section 7.3 hereof.

6.3    Upon the occurrence of any of the following events, Barton may, by giving written notice to Distributor, immediately terminate this Agreement, without obligation to comply with the provisions of Section 6.5 and without paying any amount to Distributor except with respect to repurchase of Distributor's inventory pursuant to Section 7.3 and any outstanding promotional credits due to Distributor:

(a)    Revocation or non-renewal of Distributor's federal, state or local license or permit to sell or distribute beer;

(b)    Suspension for a period of 14 calendar days of Distributor's federal, state or local license or permit to sell or distribute beer;

(c)    The inability of Distributor to pay its debts as they mature; or Distributor's liabilities exceed the fair market value of its assets; or the filing by Distributor of a voluntary petition seeking relief under any provision of any bankruptcy or other law for the relief of debtors; or the filing of a petition seeking to have Distributor declared bankrupt or seeking any reorganization or recapitalization of Distributor, unless such petition shall have been vacated within 30 days from the filing thereof prior to the effective date of the termination of this Agreement; or the appointment of a receiver or trustee for a substantial portion of the property or assets of Distributor, unless such appointment shall have been vacated within 30 days from the date thereof and prior to the effective date of the termination of this Agreement; or the execution by Distributor of an assignment for the benefit of creditors; or the dissolution or liquidation of Distributor;

(d)    Conviction of Distributor, any owner of Distributor or any manager of a felony or other crime that, in Barton's reasonable judgment, may adversely affect the goodwill of Distributor or Barton, and, if the conviction is of a manager or a non-controlling owner, failure by Distributor to dismiss such manager or non-controlling owner within thirty (30) days of such conviction;

(e)    Fraudulent conduct or intentional misrepresentation on the part of Distributor, any owner of Distributor, any manager or any similarly high-level employee of Distributor in dealing with Barton or the Subject Beverages;

(f)    Distributor's failure to pay Barton for Subject Beverages purchased from Barton when such payment is due under the terms and conditions of sale established by Barton from time to time, for 5 days after written notice from Barton of such failure to pay;

(g)    Intentional conduct by the managers or employees of Distributor in permitting the sale of Subject Beverages outside the quality standards set forth in the Manual, and  if such conduct is committed by an employee, failure by Distributor to dismiss such employee within thirty (30) days of notice that such conduct has occurred;

(h)     The cessation of Distributor's business for 14 consecutive days, unless such cessation is the result of acts of God, war or conditions of national state or local emergencies, provided that cessation of Distributor's business for 30 consecutive days for any reason shall be a basis for immediate termination of this Agreement; OR

(i)     Distributor's breach or violation of Section 1.2 of this Agreement.

6.4     The following shall be considered "Deficiencies":

(a)     Failure by Distributor to comply with any of the requirements of the Manual;

(b)     Failure by Distributor to comply with any of the duties of Distributor set forth in Article 3 and the specific performance goals, if any, set forth in Exhibit III attached hereto;

(c)     Any act or omission by Distributor that constitutes a Deficiency pursuant to the "Deficiency, Cure and Termination" section of the Manual;

(d)     Failure by Distributor to make timely payment of any obligation owing to Barton other than payment for Subject Beverages as set forth in Section 6.3(f); and

(e)     Failure by Distributor to perform any of the other obligations, duties or responsibilities under this Agreement.

6.5     Barton may, at any time, give Distributor's general manager and owner/principal written notice of a Deficiency, and shall follow the procedures set forth below in connection with such notice.

(a)     The notice shall specify the Deficiency(ies) and the time period within which each Deficiency must be corrected.   To the extent that such Deficiency cannot reasonably be corrected within 30 days of the receipt of Barton's written notice of Deficiency, Distributor shall have a period of 30 days from such notice to submit a detailed plan and timetable of corrective action for Barton's review and approval, which approval will not be unreasonably withheld.   Barton and Distributor shall agree upon a reasonable timetable to correct to Barton's satisfaction each Deficiency set forth in Distributor's plan of corrective action, but in no event shall such period exceed 120 days from Barton's notice of Deficiency.   Distributor shall not be permitted to cure any Deficiency which has been the subject of a previous notice of deficiency and cure on two or more prior occasions within the 24-month period prior to the subject deficiency.

(b)     If (i) Distributor fails to cure any Deficiency to Barton's reasonable satisfaction within the appropriate time period, or (ii) the subject deficiency has been the subject of a previous notice of deficiency and cure on two or more prior occasions within the prior 24-month period, then Barton may, by giving written notice to Distributor, immediately terminate this Agreement.   On the effective date of termination Barton will pay to Distributor, in full and complete satisfaction, waiver and discharge of all claims of whatever nature that Distributor may have against Barton and its affiliates, arising out of or with respect to the termination, as liquidated damages and not as a penalty, a sum equal to Distributor's Net Effective Profit (as defined in Section 5.6) attributable to Distributor's sale of the Subject Beverages to retailers in its Territory for the most recent 12-month period. All credits and debits incurred in the normal course of business up to the date of

termination will be settled between Barton and Distributor. These include promotional allowances resulting from authorized programs, outstanding pre-approved credits, deposits on kegs and pallets, etc. These amounts will be treated separately from the Net Effective Profit calculation. These payments shall be in addition to any amounts payable for repurchase of inventory under Section 7.3. In lieu of termination and notwithstanding Section 1.1, Barton may elect to alter Exhibit I so as to reduce Distributor's Territory and/or alter Exhibit II so as to remove one or more of the Subject Beverages that Distributor may buy and resell under this Agreement.

6.6     Barton shall have the right, upon 30 days written notice to Distributor, to terminate this Agreement upon the failure by Distributor to achieve the reasonable case volume and/or distribution goals set pursuant to Section 3.3(a) and the Manual for two consecutive years, other than by reason of Distributor being put on equitable allocation or Barton's failure to deliver Subject Beverages ordered by Distributor as set forth in Section 4.6. On the effective date of termination Barton will pay to Distributor, in full and complete satisfaction, waiver and discharge of all claims of whatever nature that Distributor may have against Barton and its affiliates, arising out of or with respect to the termination, as liquidated damages and not as a penalty, a sum equal to Distributor's Net Effective Profit (as defined in Section 5.6) attributable to Distributor's sale of the Subject Beverages to retailers in its Territory for the most recent 12-month period. All credits and debits incurred in the normal course of business up to the date of termination will be settled between Barton and Distributor. These include promotional allowances resulting from authorized programs, outstanding pre-approved credits, deposits on kegs and pallets, etc. These amounts will be treated separately from the Net Effective Profit calculation. These payments shall be in addition to any amounts payable for repurchase of inventory under Section 7.3.

6.7     Barton shall have the right to terminate this Agreement at any time by giving Distributor at least 30 days' prior written notice, provided that Barton contemporaneously gives such notice to all other Barton distributors located in Distributor's state or, if the termination notice relates to a specific brand(s), to all distributors with an agreement to distribute such brand(s). Barton shall incur no liability to Distributor by reason of such termination. In the event Barton exercises its rights under this Section and offers other distributors the right to enter into a new agreement within 90 days of such termination, then Barton shall offer Distributor the right to enter into a new agreement upon substantially similar terms and conditions.

7.     **POST TERMINATION PROVISIONS**

Upon the termination or expiration of this Agreement for any reason, the following provisions shall apply.

7.1     Barton shall have the right to terminate unfilled orders and to stop or re-route any shipment en-route to Distributor.

7.2     Within five days after such termination, Distributor shall make available to Barton all property belonging to Barton in Distributor's possession or control. Barton shall not be liable to Distributor for any expenses incurred by Distributor in connection with such property. If Distributor has placed a deposit with Barton on any such property, Barton shall refund such deposit to Distributor or credit an equivalent amount to Distributor's account when such property is returned in useable and merchantable condition.

7.3     Within five days after termination, Distributor shall sell, and Barton or its designee shall purchase, Distributor's undamaged, merchantable and originally packaged inventory of non-overage Subject Beverages purchased from Barton at Distributor's laid-in cost therefor, FOB Distributor's shipping dock.    In addition, Distributor shall relinquish possession of all promotional materials, including but not limited to wearables, in its possession relating to the Subject Beverages and deliver the same to Barton or its designee FOB Distributor's shipping dock.

In lieu of paying the purchase price described above for inventory, Barton may, at its election, credit any outstanding balance to Distributor's account.

7.4     Distributor shall cooperate with Barton and any successor distributor throughout the post-termination process, and shall refrain from intentionally taking any action after the date of termination which would in any way cause injury to Barton or its affiliates, the reputation of the Subject Beverages and the other products of Barton and its affiliates, or the goodwill associated with those products, save and except in the course of lawful competition.

7.5     No later than 10 days after termination, Distributor shall provide Barton with a detailed, 24-month sales history for the Territory, organized by Subject Beverages and retail account.    This summary shall be provided in electronic format acceptable to Barton or, at Barton's election in paper format, to the appropriate Barton field sales person.

7.6     In the event that Barton pays a termination payment to Distributor pursuant to Sections 5.3 or 6.2 hereof, Barton may elect to hold up to 10% of such payment amount in escrow pending review of the Territory for overage Subject Beverages.    Within 30 days of the date of termination Barton shall either remit the entire amount withheld or a portion of such amount with an accounting for any subtractions as a result of having to remove any Subject Beverages that were overage on the termination date from retailers in the Territory and destroy such overage Subject Beverages in accordance with state and federal law.

8.    **TRADEMARKS**

(a)     It is understood and agreed that the trademarks, trade names, trade dress, brand names, labels and designs (collectively, the "Trade Designations") used by Barton or its affiliates with respect to bottles, packages and other goods which have been or may be hereafter sold by Barton to Distributor are not the property of Distributor.  Distributor shall acquire no property interest or ownership in the Trade Designations by virtue of this Agreement, and Distributor agrees that it will not claim any rights in the Trade Designations and that it will not interfere with Barton's rights therein.  Distributor shall, at any time requested, whether during or subsequent to the term hereof, disclaim in writing any property interest or ownership in the Trade Designations.

(b)     Distributor shall protect Barton's interest in the Trade Designations and shall refrain from taking any action that would damage Barton's interest in and the goodwill associated with the Trade Designations.    This obligation shall include, without limitation:  (i) preventing Subject Beverages bearing expired code dates from reaching retailers or consumers; (ii) retrieving overage Subject Beverages from retail locations; (iii) ensuring draft lines are properly cleaned and maintained; and (iv) filling retailer orders on a timely, consistent basis in accordance with the requirements set forth in the Manual in order to prevent out-of-stock situations.

(c)     As the authorized licensee of the Trade Designations, Barton grants Distributor a non-exclusive, non-assignable, non-licensable privilege to use the Trade Designations only in a

lawful manner and in connection with the distribution, advertising, display and sale of the Subject Beverages.  This privilege shall terminate upon termination of this Agreement.

(d)     Barton shall have the right, at any time, to change or modify the Trade Designations of the Subject Beverages sold in the Territory.

(e)     Distributor will use the Trade Designations only as approved by Barton in writing and, at Barton's request, will change or discontinue the way it uses any trademarks.

9.     **FORCE MAJEURE**

Neither Distributor nor Barton shall be liable for failure to perform hereunder by reason of causes beyond its control, including, but not limited to, fire, flood, war, embargo, railcar shortages, accident, explosion, riot, insurrection, earthquakes, Acts of God, governmental laws or regulations, taking of its property by governmental authority, or shortages of material or supplies of any kind.

10.     **INDEMNIFICATION**

Each of the parties hereto hereby agrees to indemnify and hold the other harmless from and against any and all liabilities, losses, damages, costs or expenses which the other may hereafter incur, suffer or be required to pay by reason of the breach by the other of any of the terms and conditions set forth within this Agreement and further, specifically, but without limitation, by reason of any false or misleading advertising, or the failure to possess or maintain any of the federal, state or local licenses or permits required under applicable laws.  In addition, Barton shall indemnify and hold harmless Distributor from and against any liabilities, losses, damages, costs or expenses arising out of any defects in the Subject Beverages, their containers or packaging, except when such defects are the result of any acts or omissions of Distributor or its agents.  Further, in the event that any action, suit or proceeding is threatened or brought against either party, upon any liability or other form of claim based upon or arising out of any matter contemplated under this Section 10, such party shall, within five days of receipt by it of notice of such actual or threatened action, suit or proceeding or other form of claim, give written notice thereof to the other party.

11.     **RESOLUTION OF DISPUTES**

11.1     If any dispute shall occur between Distributor and Barton with regard to Section 2.3 or Section 3.3(a) of this Agreement, and such dispute cannot be resolved by Distributor and the appropriate Barton sales personnel, then within the time limits set forth in such Sections the dispute shall be submitted to the President of Barton Beers and the principal of Distributor for expedited resolution.    The parties shall meet in a timely manner and in good faith attempt to resolve the dispute.    Such informal, expedited dispute resolution shall be a condition precedent to Distributor's right to pursue any other remedy available under this Agreement or otherwise available under law.

11.2     Except as set forth above, any and all controversies in connection with or arising out of this Agreement or the breach or termination thereof that are not resolved by mutual agreement shall be submitted to non-binding mediation in such form as shall be agreed to by the parties, with each party bearing its own costs of mediation.    Controversies that are not resolved through mediation within 45 days of being submitted thereto shall be submitted to final and binding arbitration before JAMS, or its successor, pursuant to the United States Arbitration Act, 9 U.S.C. Sec. 1 et. Seq.  Either party may commence the arbitration process called for in this Agreement by filing a written demand for arbitration with JAMS, with a copy to the other party.    If the amount in controversy is less than $250,000 the arbitration will be conducted in accordance with the provisions of JAMS' Streamlined Arbitration Rules and Procedures in effect at the time of filing the claim, and

otherwise the arbitration will be conducted in accordance with JAMS' Comprehensive Arbitration Rules and Procedures. The parties will cooperate with JAMS and with one another in selecting an arbitrator from JAMS panel of neutrals, and in scheduling the proceedings. The parties covenant that they will participate in the arbitration in good faith. Any and all disputes shall be submitted to arbitration hereunder within one year from the date the dispute first arose or shall be forever barred.

11.3    All proceedings hereunder shall be conducted at Chicago, Illinois. The laws of the state where Distributor is located shall be applied during these proceedings. The cost and expenses of any proceeding hereunder, including the compensation of the arbitrators or neutrals hereunder, shall be allocated between the parties hereto by the arbitrators or neutrals. Every decision and award of the arbitrators or neutrals appointed in accordance with the provisions of Section 11.2 and this Section shall be final and binding on the parties hereto. The provisions of Section 11.2 and this Section may be enforced by any court of competent jurisdiction, and each party shall bear its own costs, fees and expenses, including attorneys fees, in connection with such a proceeding.

11.4    Nothing herein shall preclude Barton from exercising any of its rights with respect to any security interest or guarantee held by it or prevent Barton and/or Distributor from instituting any attachment, replevin or similar proceedings, or equitable proceedings to enforce its rights under this Agreement during the pendency of any proceeding hereunder or otherwise.

## 12.    **MISCELLANEOUS PROVISIONS**

12.1    The parties acknowledge that certain provisions of this Agreement may conflict with the laws of certain states. Rather than attempting to conform this Agreement to the laws of each state, the parties intend that all of the terms and provisions of this Agreement are made subject to all applicable federal, state and local laws, and in the performance of this Agreement both parties shall comply with such laws. If any part of this Agreement is construed or held to be invalid or in violation of any such law, including applicable state franchise laws, such part shall be deemed to be and shall be eliminated from this Agreement without affecting the enforceability of the remainder thereof.

12.2    This Agreement shall not be assigned, pledged or hypothecated by Distributor without Barton's prior written consent to such assignment, which consent shall not be unreasonably withheld.

12.3    This Agreement and the exhibits attached hereto and the Manual embody all understandings and agreements between the parties hereto and none of the parties has made any representations or promises other than those set forth herein, and Distributor has not and shall not be required to pay, directly or indirectly, a franchise fee to Barton as a condition to Distributor's appointment, or the continuation thereof, as a wholesaler of the Subject Beverages. This Agreement may not be modified except by a written instrument duly executed by the party to be charged. This Agreement shall be governed in all respects by the laws of the State of Washington.

12.4    This Agreement shall supersede all arrangements or Agreements relating to the distribution of any or all of the subject beverages previously entered into or made between Barton and Distributor in relation to the Territory and all such arrangements or Agreements are terminated by this Agreement.

12.5    Upon the termination of this Agreement, the parties agree to terminate all agreements then existing between them, effective with such termination, but this shall not be construed as constituting a forgiveness of any indebtedness then owed by either party to the other, nor shall either party be considered to have waived any right or rights which it may have against the other growing out of this Agreement, and nothing herein contained shall in any event or in any way limit or otherwise affect any security interests or guarantees received by Barton.

12.6    The parties agree that at the date of this Agreement neither of them has any known claim against the other for damages, reimbursement of expenses (other than in the ordinary course of business), misrepresentation or breach of contract or any claim against the other of any nature (except for merchandise purchased by Distributor from Barton and not yet paid for and any outstanding promotional credits due to Distributor), and in consideration of their entering into this Agreement, any and all such known claims of each party are hereby fully and forever discharged and released by such party (except claims for merchandise purchased and outstanding promotional credits, as aforesaid).

12.7    Distributor represents that the person signing this Agreement has the necessary power and authority to execute this Agreement and to bind Distributor to perform its obligations hereunder.

12.8    Failure on the part of either party to insist upon or enforce performance of any provision of this Agreement shall not be construed as a waiver of rights under that provision and shall not be a waiver of rights under or affect any other provision of this Agreement.

12.9    Any notice hereunder shall be in writing and shall be deemed to have been duly given if delivered or faxed and confirmed by overnight mail, addressed to the party for whom intended as follows:

**IF TO BARTON, TO:**

**Barton Beers, Ltd.**
55 East Monroe Street, Suite 2600
Chicago, Illinois 60603
Attention:  Mr. William F. Hackett

With a copy to:

**Barton Beers, Ltd.**
55 E. Monroe Street, Suite 2600
Chicago, Illinois 60603
Attn:  Legal Department

**IF TO DISTRIBUTOR, TO:**

**City Beverages, LLC.**
8409 Durango St. SW
Lakewood, Washington 98499
Attention:  Mr. Steve Knight

or to such other address as either party may designate for itself by written notice to the other party given in the manner set forth above, provided that notice of a change of address shall be deemed given only upon receipt.

12.10  Any financial, credit, sales, depletion, marketing, distribution, trend, retail account and/or business information related to the Subject Beverages, including information about Barton's Third Party suppliers, together with any other proprietary information Barton discloses to Distributor is hereinafter referred to as "Barton Confidential Information". Any financial or other proprietary business information that is not related to the Subject Beverages and is disclosed by Distributor to Barton is herein after referred to as "Distributor Confidential Information" ("Barton Confidential Information" and "Distributor Confidential Information" together are referred to as "Confidential Information"). Confidential Information does not include information which (a) becomes generally available to the public other than as a result of an improper disclosure by Distributor, Barton or either of their agents, (b) was available on a non-confidential basis prior to its disclosure by Barton or Distributor, as applicable, or (c) becomes available on a non-confidential basis from a source other than Barton or Distributor, as applicable, provided that such source is not bound by a confidentiality agreement or such disclosure was not otherwise unlawful. Distributor agrees to keep the Barton Confidential Information confidential and will not disclose the Barton Confidential Information to any other party without the prior written consent of Barton. Barton agrees to keep the Distributor Confidential Information confidential and will not disclose the Distributor Confidential Information to any other party without the prior written consent of Distributor. The parties agree that a breach of this Section would cause irreparable injury, and that the non-breaching party shall be entitled to equitable relief, including injunctive relief and specific performance, in the event of any breach of this Section.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the day and year first above written.

**BARTON BEERS, LTD.**

By: _____

Its: _____


**CITY BEVERAGES, LLC.**

By: _____

Its: _____

EXHIBIT B TO COMPLAINT FOR EQUITABLE RELIEF



Dear Olympic Eagle Distributing Team,

Congratulations! It's with immense pleasure that we congratulate you and your team on winning the Gold Crown – Tier 3 Award, taking 1st place regionally and 1st place nationally. It should be a proud moment for all the members of Olympic Eagle Distributing. Below are details regarding what your distributorship will receive as the recipient of these awards:

- **Gold Crown Award – Tier 3 – 1st Place Regional Winner and 1st Place National Winner**
  - Incremental market investment of $40,000
  - Trips to St. Kitts
  - Distributor party valued at $10,000
  - Trophies commemorating your achievement
  - Banners that can be hung in your warehouse

Our team will soon be in contact with you to develop a plan to effectively utilize these incremental funds in your market.

Our Gold Crown regional award is given to Gold Network partners who achieve the highest attainment of their ABP volume and distribution goals. The national winners are then determined via a scorecard of each tier's first place regional winners.

As we grow our mutual business, these awards are an important part of recognizing the significant accomplishments of our Gold Network partners. We hope you and your team take great pride in these successes.

Congratulations again on receiving this prestigious and deserving award. We look forward to your active participation in 2019.

Sincerely,

CONSTELLATION BRANDS BEER DIVISION                    CONSTELLATION BRANDS BEER DIVISION

Bill Renspie                                                                      Stash Rowley
Chief Sales Officer                                                          Sr. Vice President - Sales, West Business Unit

cc:      John Williams
         Erin Tait

EXHIBIT C TO COMPLAINT FOR EQUITABLE RELIEF



**Constellation Brands**

**VIA UPS**

September 8, 2022

Olympic Eagle Distributing LLC d/b/a City Beverage
Attn: Steve Knight, CEO
1101 N. Levee Rd.
Puyallup, WA  98371-3236

Re: Crown Imports Distribution Rights

Dear Sirs:

I am writing to provide you with written notice that Crown Imports LLC d/b/a/ Constellation Brands Beer Division ("Constellation") is terminating the Distribution Agreement dated October 22, 2003, as amended (the "Agreement), with Olympic Eagle Distributing LLC d/b/a City Beverage ("Olympic Eagle"). Olympic Eagle has 60 days from today's date to transfer its rights to distribute the Subject Beverages (as that term is used in the Agreement) to another distributor, subject to Constellation's approval.

Until the Subject Beverages are transferred, we will conduct business as usual and devote efforts to minimize any disruption in the Territory.

If you have any questions, please do not hesitate to contact me.

Sincerely,

W Renspie

William Renspie, Chief Customer Officer
Constellation Brands Beer Division
william.renspie@cbrands.com

cc:     *Via Email*
        Stash Rowley, SVP, Western Business Unit
        John Williams, VP, General Sales Manager, Western Business Unit
        Kristen Klanow, VP, Associate General Counsel

*Our vision: To elevate life with every glass raised*

**Constellation Brands, Inc.** 131 S. Dearborn · Suite 1200 · Chicago, Il. 60603
Direct: 312-873-9600 · www.cbrands.com

Exhibit C to Complaint for Equitable Relief, Page 1 of 1

EXHIBIT D TO COMPLAINT FOR EQUITABLE RELIEF

cyberdriveillinois.com is now ilsos.gov



Office of the Secretary of State Jesse White

ilsos.gov

# Corporation/LLC Search/Certificate of Good Standing

## LLC File Detail Report

| | |
|---|---|
| File Number | 01961942 |
| Entity Name | CROWN IMPORTS LLC |
| Status | ACTIVE |

### Entity Information

**Principal Office**
131 S. DEARBORN, STE 1200
CHICAGO, IL 606030000

Entity Type
LLC

Type of LLC
Foreign

Organization/Admission Date
Thursday, 7 September 2006

Jurisdiction
DE

Duration
PERPETUAL

## Agent Information

Name
C T CORPORATION SYSTEM

Address
208 SO LASALLE ST, SUITE 814
CHICAGO , IL 60604

Change Date
Thursday, 7 September 2006

## Annual Report

For Year
2022

Filing Date
Tuesday, 23 August 2022

## Managers

Name
Address
DOMINACH, OKASANA S.
207 HIGH POINT DR, BLDG 100
VICTOR, NY 14564

Name
Address
KLANOW, KRISTEN
131 S. DEARBORN ST.
CHICAGO, IL 60603

Name
Address
DIGGINS, KELLY J.
207 HIGH POINT DR, BLDG 100
VICTOR, NY 14564

Name
Address
BAHR, JESSICA
131 S. DEARBORN ST.

CHICAGO, IL 60603

Name
Address
BILLINGTON, MICHELLE
207 HIGH POINT DRIVE, BLDG 100
VICTOR, NY 145640000

Name
Address
MERRIMAN, LONETTE K.
207 HIGH POINT DR, BLDG 100
VICTOR, NY 145640000

Name
Address
BECKA, MICHAEL
131 S. DEARBORN ST.
CHICAGO, IL 606030000

Name
Address
LABARGE, JEFFREY H.
207 HIGH POINT DRIVE, BLDG 100
VICTOR, NY 145640000

Name
Address
MCCORRY, THOMAS M.
207 HIGH POINT DRIVE, BLDG 100
VICTOR, NY 145640000

Name
Address
METZ, KENNETH
207 HIGH POINT DRIVE, BLDG 100
VICTOR, NY 145640000

Name
Address
REITZ, MICHAEL
207 HIGH POINT DRIVE, BLDG 100
VICTOR, NY 145640000

Name
Address
ROBINS, TIMOTHY D.
207 HIGH POINT DRIVE, BLDG 100
VICTOR, NY 145640000

Name
Address
VIVIANO, JEFFREY
207 HIGH POINT DRIVE, BLDG 100
VICTOR, NY 145640000

Name
Address
SABIA, JAMES S. JR
131 S. DEARBORN STREET
CHICAGO, IL 606030000

Name
Address
BENNETT, BRIAN S.
207 HIGH POINT DRIVE, BLDG. 100
VICTOR, NY 145640000

Name
Address
BARNETT, CHELSEA
207 HIGH POINT DRIVE, BLDG. 100
VICTOR, NY 145640000

## Assumed Name

ACTIVE
TOCAYO BREWING COMPANY

ACTIVE
CONSTELLATION BRANDS

ACTIVE
CROWN IMPORTS

ACTIVE
MONARCH IMPORT COMPANY

## Series Name

NOT AUTHORIZED TO ESTABLISH SERIES



Return to Search

File Annual Report

Adopting Assumed Name

Articles of Amendment Effecting A Name Change

Change of Registered Agent and/or Registered Office

(One Certificate per Transaction)

This information was printed from www.ilsos.gov, the official website of the Illinois Secretary of State's Office.        Tue Oct 04 2022



Filed
Secretary of State
State of Washington
Date Filed: 08/12/2022
Effective Date: 08/12/2022
UBI #: 602 669 360

# Annual Report

## BUSINESS INFORMATION

Business Name:
**CROWN IMPORTS LLC**

UBI Number:
**602 669 360**

Business Type:
**FOREIGN LIMITED LIABILITY COMPANY**

Business Status:
**ACTIVE**

Principal Office Street Address:
**131 S DEARBORN ST, CHICAGO, IL, 60603-5517, UNITED STATES**

Principal Office Mailing Address:
**207 HIGH POINT DR, BUILDING 100, VICTOR, NY, 14564-1061**

Expiration Date:
**11/30/2023**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/Registration Date:
**11/16/2006**

Period of Duration:
**PERPETUAL**

Inactive Date:

Nature of Business:
**WHOLESALE TRADE**

## REGISTERED AGENT     RCW 23.95.410

| Registered Agent Name | Street Address | Mailing Address |
| --- | --- | --- |
| C T CORPORATION SYSTEM | 711 CAPITOL WAY S STE 204, OLYMPIA, WA, 98501-1267, UNITED STATES | 711 CAPITOL WAY S STE 204, OLYMPIA, WA, 98501-1267, UNITED STATES |

## PRINCIPAL OFFICE

Phone:
**5856787232**

Email:

This document is a public record. For more information visit www.sos.wa.gov/corps

**DAWN.TRAFICANTI@CBRANDS.COM**

Street Address:
**131 S DEARBORN ST, CHICAGO, IL, 60603-5517, USA**

Mailing Address:
**207 HIGH POINT DR, BUILDING 100, VICTOR, NY, 14564-1061, USA**

# GOVERNORS

| Title | Type | Entity Name | First Name | Last Name |
|-------|------|-------------|------------|-----------|
| GOVERNOR | INDIVIDUAL | | KRISTEN | KLANOW |
| GOVERNOR | INDIVIDUAL | | GARTH | HANKINSON |
| GOVERNOR | INDIVIDUAL | | OKSANA | DOMINACH |
| GOVERNOR | INDIVIDUAL | | JAMES | BOURDEAU |
| GOVERNOR | INDIVIDUAL | | TIMOTHY | ROBINS |
| GOVERNOR | INDIVIDUAL | | JESSICA | BAHR |
| GOVERNOR | INDIVIDUAL | | KELLY | DIGGINS |
| GOVERNOR | INDIVIDUAL | | JEFFEREY | LABARGE |
| GOVERNOR | INDIVIDUAL | | LONETTE | MERRIMAN |
| GOVERNOR | INDIVIDUAL | | KENNETH | METZ |
| GOVERNOR | INDIVIDUAL | | JEFFREY | VIVIANO |
| GOVERNOR | INDIVIDUAL | | MICHAEL | REITZ |
| GOVERNOR | INDIVIDUAL | | MICHAEL | BECKA |
| GOVERNOR | INDIVIDUAL | | THOMAS | MCCORRY |
| GOVERNOR | INDIVIDUAL | | MICHELLE | BILLINGTON |
| GOVERNOR | INDIVIDUAL | | BRIAN | BENNETT |
| GOVERNOR | INDIVIDUAL | | JAMES | SABIA |
| GOVERNOR | INDIVIDUAL | | CHELSEA | BARNETT |

# NATURE OF BUSINESS

ᴵ WHOLESALE TRADE

# EFFECTIVE DATE

Effective Date:
**08/12/2022**

# CONTROLLING INTEREST

1. Does this entity own (hold title) real property in Washington, such as land or buildings, including leasehold improvements?
**NO**
2. In the **past 12 months**, has there been a transfer of at least 16-2/3 percent of the ownership, stock, or other financial interest in the entity?
**NO**
    a. If "Yes", in the **past 36 months**, has there been a transfer of controlling interest (50 percent or greater) of the ownership,

This document is a public record. For more information visit www.sos.wa.gov/corps

Work Order #: **2022081200500979 - 1**
Received Date: **08/12/2022**
Amount Received: **$60.00**
Exhibit D to Complaint for Equitable Relief, Page 8 of 9

stock, or other financial interest in the entity?
**NO**
3.  If you answered "Yes" to question 2a, has a controlling interest transfer return been filed with the Department of Revenue?
**NO**

You **must** submit a Controlling Interest Transfer Return form if you answered "yes" to questions 1 **and** 2a.

Failure to report a Controlling Interest Transfer is subject to penalty provisions of RCW 82.45.220.

For more information on **Controlling Interest**, visit www.dor.wa.gov/REET.

## RETURN ADDRESS FOR THIS FILING

Attention:
**DAWN TRAFICANTI**
Email:
**DAWN.TRAFICANTI@CBRANDS.COM**
Address:
**207 HIGH POINT DR, BUILDING 100, VICTOR, NY, 14564-1061, USA**

## UPLOAD ADDITIONAL DOCUMENTS

Do you have additional documents to upload? **No**

## EMAIL OPT-IN

☐  By checking this box, I hereby opt into receiving all notifications from the Secretary of State for this entity via email only. I acknowledge that I will no longer receive paper notifications.

## AUTHORIZED PERSON

☑  I am an authorized person.

Person Type:
**INDIVIDUAL**

First Name:
**BRIAN**

Last Name:
**BENNETT**

Title:
**SECRETARY**

☑  This document is hereby executed under penalty of law and is to the best of my knowledge, true and correct.

---

This document is a public record. For more information visit www.sos.wa.gov/corps

Work Order #: 2022081200500979 - 1
Received Date: 08/12/2022
Amount Received: $60.00
Exhibit D to Complaint for Equitable Relief, Page 9 of 9