UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CITY BEVERAGES LLC, d/b/a Olympic Eagle Distributing, a Missouri limited liability company with its principal place of business in Washington<br><br>                Plaintiff,<br>   v.<br><br>CROWN IMPORTS LLC, d/b/a Constellation Brands Beer Division, a Delaware corporation with its principal place of business in Illinois; CONSTELLATION BRANDS, Inc, a Delaware corporation with its principal place of business in New York<br><br>                Defendants. | CASE NO. 3:22-cv-05756-DGE<br><br>ORDER ON DEFENDANTS' MOTION FOR RECONSIDERATION (DKT. NO. 46) AND PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (DKT. NO. 4) |

**I****INTRODUCTION**

This matter comes before the Court on Plaintiff Olympic Eagle Distributing's ("Olympic") motion for a preliminary injunction (Dkt. No. 4). For the reasons stated herein, the Court GRANTS Olympic's motion and DENIES Defendants Constellation Brands Beer Division

ORDER ON DEFENDANTS' MOTION FOR RECONSIDERATION (DKT. NO. 46) AND PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (DKT. NO. 4) - 1

and Constellation Brands Inc.'s (together "Constellation") motion for reconsideration (Dkt. No 46) of the Court's temporary restraining order as moot.[1]

## II   BACKGROUND

Since 2003, Olympic has overseen "distributing, marketing, advertising, and merchandizing Constellation Brands beer in Olympic's designated Pierce and King County distribution territory." (Dkt. No. 4 at 10.) By letter dated September 8, 2022, Constellation informed Olympic it was terminating the October 22, 2003, Distribution Agreement. (Dkt. No. 5-4 at 2.) Constellation also stated Olympic had 60 days from the date of the letter to transfer all rights to another distributor, "subject to Constellation's approval." (*Id*.) The letter did not state the termination was for cause, without cause, or because Olympic failed to meet its obligations under the Distribution Agreement; in essence, no information was provided. (*See id*.)

As described in the Complaint:

> [A] few days after it received the termination notice, Olympic Eagle received a call from the CEO of its largest competitor, Columbia Beverages. When Olympic Eagle's CEO, Steve Knight, returned the call, Columbia's CEO Chris Steffanci said his company was Constellation's 'preferred buyer,' and he offered to pay seven times 12 months trailing earnings, which would be about $70 million.

(Dkt. No. 1 at 3.)

Under the Wholesale Distributor/Supplier Equity Agreement Act, RCW Chapter 19.126 (the "Act"), a distributor terminated for any reason other than cause is entitled compensation from the successor distributor for the fair market value of the rights. Wash. Rev. Code § 19.126.040(4).

---

[1] The Court's prior order noted "[t]he temporary restraining order shall remain in effect until this Court issues a ruling on Olympic Eagle's Motion for a Preliminary Injunction (Dkt. No. 4)." (Dkt. No. 45 at 3.) Having ruled on Plaintiff's motion for a preliminary injunction, the Court's prior temporary restraining orders are moot.

### III  DISCUSSION

**A. Preliminary Injunction Legal Standard**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  A party seeking a preliminary injunction must establish (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) a balance of equities tips in favor of a preliminary injunction; and (4) that an injunction is in the public interest.  *Id.* at 20; *see also Coffman v. Queen of Valley Med. Ctr.*, 895 F.3d 717, 725 (9th Cir. 2018).

The Ninth Circuit also articulated an alternative "sliding scale" approach pursuant to which the first and third *Winter* factors are analyzed on a continuum; under such standard, a weaker showing on the merits, combined with a stronger demonstration on the balancing test, might warrant preliminary injunctive relief, assuming the second and fourth Winter elements are met.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011).  Under this "sliding scale" method, the movant need only raise "serious questions going to the merits," but the balance of hardships must tip "sharply" in the movant's favor.  *Id.* at 1131-32; *see also Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012).

**B. Likelihood of Success on the Merits**

  1. <u>The Wholesale Distributor/Supplier Equity Agreement Act</u>

The Act "governs the relationship between suppliers of malt beverages and spirits and their wholesale distributors[.]"  Wash. Rev. Code § 19.126.010(2).  The Act provides wholesale distributors certain protections "which are deemed to be incorporated into every agreement of distributorship[.]"  Wash. Rev. Code § 19.126.040.

The Act states:

(1) Agreements between wholesale distributors and suppliers must be in writing;

(2) A supplier must give the wholesale distributor at least sixty days prior written notice of the supplier's intent to cancel or otherwise terminate the agreement, unless such termination is based on a reason set forth in RCW 19.126.030(5) or results from a supplier acquiring the right to manufacture or distribute a particular brand and electing to have that brand handled by a different distributor. The notice must state all the reasons for the intended termination or cancellation. Upon receipt of notice, the wholesale distributor has sixty days in which to rectify any claimed deficiency. If the deficiency is rectified within this sixty-day period, the proposed termination or cancellation is null and void and without legal effect;

(3) The wholesale distributor may sell or transfer its business, or any portion thereof, including the agreement, to successors in interest upon prior approval of the transfer by the supplier. [];

(4) If an agreement of distributorship is terminated, canceled, or not renewed for any reason other than for cause, failure to live up to the terms and conditions of the agreement, or a reason set forth in RCW 19.126.030(5), the wholesale distributor is entitled to compensation from the successor distributor for the laid-in cost of inventory and for the fair market value of the terminated distribution rights. [];

(5) When a terminated distributor is entitled to compensation under subsection (4) of this section, a successor distributor must compensate the terminated distributor for the fair market value of the terminated distributor's rights to distribute the brand, less any amount paid to the terminated distributor by a supplier or other person with respect to the terminated distribution rights for the brand. [].

§§ 19.126.040(1)-(5).

The Parties dispute whether the Act permits a covered supplier to terminate a distribution agreement without cause. Olympic argues the Distribution Agreement was a nationwide form contract used in multiple states and any language Constellation relies on allegedly allowing it to terminate without cause is included in the event the State's statute permits termination without cause. (Dkt. Nos. 26 at 8–9; 4 at 18–20.) Olympic argues there is no authority to terminate without cause in the Distribution Agreement and the Act does not grant Constellation the right to terminate without cause. (*Id.*)

Constellation argues "termination without cause is entirely consistent with the Act if the parties' written agreement allows for termination without cause." (Dkt. No. 19 at 2.)

ORDER ON DEFENDANTS' MOTION FOR RECONSIDERATION (DKT. NO. 46) AND PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (DKT. NO. 4) - 4

Constellation cites the language in § 19.126.040(4) as evidence of the legislature's intent to permit without cause terminations by suppliers because of the inclusion of the "any reason other than for cause" clause of this section and language providing a statutory remedy for distributors. (Dkt. No. 19 at 2–3.)

Few courts have had the opportunity to interpret the precise language of the Act. The retired Honorable Judge Ronald B. Leighton reviewed the language in a series of cases between Pabst Brewing Company and several distributors that it terminated without cause. *Stein Distrib. Inc. v. Pabst Brewing Co., LLC*, 2017 WL 2313489 (W.D. Wash. May 26, 2017); *Odom Corp. v. Pabst Brewing Co., LLC*, 2017 WL 2313491 (W.D. Wash 2017); *Marine View Beverage, Inc. v. Pabst Brewing Co.*, LLC, 2017 WL 2313490 (W.D. Wash 2017).[2]

In *Stein*, Pabst moved to dismiss Plaintiff Stein Distributing Inc.'s complaint alleging that Pabst was liable for breach of contract when it terminated the distribution agreement between the two parties without cause and by failing to provide sixty days' notice, as required by the Act. *Stein*, 2017 WL 2313489 at *1. Stein moved for partial summary judgment as to two legal questions: " (1) whether the Act authorizes suppliers to terminate distributors' contracts without cause and (2) whether RCW 19.126.040(4) provides Stein's sole remedy for relief." *Id.*

Pabst argued the Act permitted without cause terminations and alternatively the agreements with its distributors permitted without cause terminations because there was no defined end date. *Id.* at *3–4. Stein argued "the Act does not expressly or impliedly authorize terminations without cause." *Id* at *2.

---

[2] Judge Leighton's Orders appear to contain identical analysis on the issues related to the Act. For purposes of clarity, the Court will cite to *Stein* for all citations herein.

ORDER ON DEFENDANTS' MOTION FOR RECONSIDERATION (DKT. NO. 46) AND PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (DKT. NO. 4) - 5

In response, Pabst argued "Act's acknowledgment of without-cause terminations in RCW 19.126.040(4) is synonymous with its authorization of them[.]" *Id*. at *3. The Court rejected this argument:

> Pabst incorrectly asserts that the Act's acknowledgment of without-cause terminations in RCW 19.126.040(4) is synonymous with its authorization of them. It is not. Had the Legislature intended to permit suppliers to cancel a distributor's rights without cause, it would not have mandated that in most circumstances, a distributor must have an opportunity to cure the cause leading to its potential termination. The absence of "any reason other than for cause" from RCW 19.126.040(2)'s list of exemptions from the Act's notice and opportunity-to-cure requirements similarly evidences the Legislature's intent that a distributor's rights not be terminated without cause.
>
> Had the Legislature intended to permit suppliers to cancel a distributor's rights without cause, it also could have borrowed language from Colorado's beer distributor statute: 'The supplier shall have the right to terminate an agreement with a wholesaler *at any time* by giving the wholesaler at least ninety days' written notice[.]

*Id.*

The Court agrees with Judge Leighton's previous analysis. The Act states that the proceeding protections are deemed to be incorporated into every agreement of distributorship. Wash. Rev. Code § 19.126.040. The Parties agree that the present version of the statute applies to the dispute and that parties cannot contract around the protections offered by the Act. (Dkt. No. 44 at 4.) Thus, the Court determines that the language in the Act is incorporated into the Distribution Agreement.

The Court disagrees with Constellation's contention that the "any reason other than for cause" language in § 19.126.040(4) impliedly authorized without cause terminations. (Dkt. No. 19 at 2–3.) It does not. As Judge Leighton emphasized, § 19.126.040(2) requires suppliers to give distributors sixty days' notice and a chance to rectify any claimed deficiency, with

exceptions for fraud, bankruptcy, or license revocation under § 19.126.030(5)[3] or in the event the supplier acquires new rights to manufacture or distribute a new product. If the legislature intended to permit terminations without cause, it would have added the "for cause" language into § 19.126.040(2). It did not. And it is self-evident from the language of this section that legislative authorization of without case termination would let suppliers circumvent the sixty-day notice and rectify period. *Stein*, 2017 WL 2313489, at *3.

The Court's interpretation is also supported by other Washington state courts that have had the chance to review the language of § 19.126.040. In *Mt. Hood Beverage Co. v. Constellation Brands, Inc.*, 63 P.3d 779 (Wash. 2003), for example, the Washington Supreme Court noted that the Act required distributors "to give notice **and cause** before canceling contracts with distributors." *Id.* at 786 (emphasis added). Similarly, in *Birkenwald Distrib. Co. v. Heublein, Inc.*, 776 P.2d 721 (Wash. Ct. App. 1989), the Court of Appeals clearly understood the Act to impinge on supplier's rights to terminate contracts at will. *See id.* at 723–24, 726. The basis for the court in *Birkenwald*'s holding that the Act unjustifiably impinged on contracts that existed prior to its enactment and thus "must be limited to distributorship agreements created after its effective date" was the supplier's reliance on their right to terminate their distributor "at will." *Id.* at 725–26.

Constellation argues that failure to interpret Section 4 of § 19.126.040 would lead to surplusage. (Dkt. No. 46 at 4.) Specifically, they argue that the inclusion of language providing distributors protection "for any reason other than for cause" and subsequent sections of the

---

[3] The Court also agrees with Plaintiff that the legislature "identified and listed five specific types of terminations" that were exempt from § 19.126.040(2)'s requirement of notice and cure. (Dkt. No. 49 at 7.) It is a basic rule of statutory interpretation that "expressio unius est exclusio alterius: the expression of one is the exclusion of the other." *Landmark Dev., Inc. v. City of Roy*, 980 P.2d 1234, 1239 (1999).

ORDER ON DEFENDANTS' MOTION FOR RECONSIDERATION (DKT. NO. 46) AND PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (DKT. NO. 4) - 7

statute would be meaningless if the legislature prohibited terminations without cause. (*Id.*) But this language is not rendered superfluous by such an interpretation. As noted in *Stein*, the legislature recognized that without cause terminations can happen. *Stein*, 2017 WL 2313489, at *3. For example, in § 19.126.040(2) the legislature recognized a termination "result[ing] from a supplier acquiring the right to manufacture or distribute a particular brand and electing to have that brand handled by a different distributor" would be one such example of a termination without cause. Despite this recognition of certain scenarios of permissible without cause terminations, Constellation has not explained how the legislature intended to let suppliers circumvent all the protections offered in § 19.126.040(2) by allowing a supplier to terminate without cause.

Furthermore, if the legislature intended to preserve a supplier's right to terminate without cause, it could have easily done so by adding specific language acknowledging that right, like the Colorado legislature has done. *See* Colo. Rev. Stat. Ann. § 44-3-408. Several courts have interpreted the Act to not permit termination without cause and the legislature has failed to amend this language despite having ample opportunity to do so. "The legislature, within constitutional constraints, is the body to make the policy decisions on this matter. The failure of the legislature to amend the statute . . . convinces us that it was and is the policy of the legislature to concur in that result." *Buchanan v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers*, 617 P.2d 1004, 1006 (1980)

The Court is convinced by logic of *Stein* and prior courts that the inclusion of language in § 19.126.040(4) of the Act referring to without cause terminations is not an authorization of them but merely an acknowledgement that "terminations without [cause] happen, and when they do, it mandates that the successor distributor purchase the terminated distributors' inventory and

compensate it for its lost distribution rights." *Id.* at *6. Here, Olympic sought relief before termination was completed and seeks to enforce the rights guaranteed by the Act. Therefore, the Court finds that Plaintiff has a high likelihood of success on this claim.

        2. <u>The Washington Franchise Investment Protection Act</u>

The Washington Franchise Investment Protection Act ("FIPA") provides protections for franchisees within the state, including prohibiting termination of a "franchise prior to the expiration of its term except for good cause." Wash. Rev. Code § 19.100.180(2)(j). Olympic argues it meets the definition of a franchise under FIPA and therefore the Distribution Agreement cannot be terminated without good cause. (Dkt. No. 4 at 21–24.)

Under FIPA, a "franchise" means:

(a) An agreement, express or implied, oral or written, by which:

>   (i) A person is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan prescribed or suggested in substantial part by the grantor or its affiliate;
>
>   (ii) The operation of the business is substantially associated with a trademark, service mark, trade name, advertising, or other commercial symbol designating, owned by, or licensed by the grantor or its affiliate; and
>
>   (iii) The person pays, agrees to pay, or is required to pay, directly or indirectly, a franchise fee.

Wash. Rev. Code § 19.100.010(6).

The term "substantial association" is not defined under FIPA. Courts that have interpreted the phrase relied on identical language in California's franchise law. *E. Wind Exp., Inc. v. Airborne Freight Corp.*, 974 P.2d 369, 373 (Wash. Ct. App. 1999) (recognizing that "California's franchise act [] contains the same definition of franchise as Washington's 1991 FIPA"). "To satisfy the 'substantial association' prong of FIPA's definition of a franchise, Plaintiffs must show a substantial association with [supplier]'s trade name or trademarks beyond

the act of distributing [supplier]'s products." *Atchley v. Pepperidge Farm, Inc.*, 2012 WL 6057130, at *9 (E.D. Wash. Dec. 6, 2012).

Olympic argues it is "substantially associated" with Constellation's trademarks and advertising because the Distribution Agreement granted Olympic the right to use Constellation trademarks in connection with distribution and advertising of its products. (Dkt. No. 4 at 23.) Olympic also alleges it "was required to invest substantial money, time, and resources to advertise and promote Constellation's trademarks and products through local advertising, in-store promotions and displays, and point-of-sale materials, all of which use and convey the Constellation Brand trademarks." (*Id.*)

Constellation argues that Olympic's use of Constellation's trademark alone is not enough to satisfy the substantially associated prong of the FIPA test. (Dkt. No. 19 at 17.) Constellation also argues that Olympic cannot meet this element because it distributes products for companies other than Constellation. (Dkt. No. 19 at 17–18.)

Olympic has thus far presented no evidence that its customers associated it with the Constellation trademark. *See Gabana Gulf Distribution, Ltd. v. GAP Int'l Sales, Inc.*, No. C 06-02584 CRB, 2008 WL 111223, at *5 (N.D. Cal. Jan. 9, 2008), *aff'd*, 343 F. App'x 258 (9th Cir. 2009); *see also Atchley*, 2012 WL 6057130, at *9 (noting that plaintiffs use of their supplier's trademarks did not "rise to the level of a 'substantial association' because Plaintiffs **did not prove that any other person believed or could believe** that Plaintiffs were associated with" their supplier in a capacity beyond distributorship) (emphasis added). Olympic admitted they did not submit such affirmative evidence, though they suggest that the Court may infer such an association. (Dkt. No. 44 at 27–28.)

Olympic relies heavily on *Gentis v. Safeguard Bus. Sys., Inc.*, 71 Cal. Rptr. 2d 122 (Cal Ct. App. 1998) to argue that the presence of a robust marketing plan that "requires advertising and promotion of the supplier's brands that is directed at customers" is sufficient to meet the substantial association prong. (Dkt. No. 26 at 13.) However, the appellate court in *Gentis* did not consider whether customers could reasonably associate the plaintiff in the case with their supplier's trademarks and so this case is inapposite. 71 Cal Rptr. at 123. At this time, therefore, the Court cannot conclude Olympic has a high likelihood of success on the merits as to this claim.

Nonetheless, because the Court finds Olympic has a high likelihood of success as to its claim under the Act, the Court finds the first prong of the preliminary injunction standard is satisfied.

**C. Likelihood of Irreparable Harm in the Absence of Preliminary Relief**

The phrase "irreparable harm" is a term of art, which means that a party has suffered a wrong which cannot be adequately compensated by remedies available at law, such as monetary damages. *See eBay Inc. v. Merc Exchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) ("Irreparable harm is 'harm for which there is no adequate legal remedy, such as an award for damages.'"); *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."). Although it is well established that monetary injuries are generally not considered irreparable, *Los Angeles Memorial Coliseum*, 634 F.2d at 1202, "[t]he loss of . . . an ongoing business representing many years of effort and the livelihood of its . . . owners, constitutes irreparable harm. What plaintiff stands to lose cannot

be fully compensated by subsequent monetary damages." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (quoting *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York, Inc.*, 749 F.2d 124, 125–26 (2d Cir. 1984) (per curiam)); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (evidence of threatened loss of prospective customers or goodwill supports an irreparable harm finding).

Olympic argues "Constellation's termination will wipe away Olympic's good will built up around" its broad set of product offerings.  (Dkt. No. 4 at 26.)  Citing declarations from its Vice President of Sales and Business Development Manager, Olympic argues the harm suffered by Constellation's termination will harm its reputation and goodwill with its other remaining suppliers.  (*Id*. at 26-27.)  Olympic contends that due to its broad product offerings it is chosen as the "shelf set captain" for the stores it supplies.  (*Id.*; Dkt. No. 6 at 6–7.)  The shelf set captain "is chosen by the retail store from the distributors who provide the most products to the store."  (Dkt. No. 6 at 7.)  The shelf set captain can place its products in places throughout a store that consumers are more likely to see and buy its products.  (*Id*. at 6–7.)  This allows Olympic to build up smaller brands in its portfolio of products, brands that it would not be able to sell as well if it did not receive this preferential treatment.  (*Id*.)

Olympic's Vice President of Sales attests that if Constellation terminates the Distribution Agreement, Olympic will no longer be shelf set captain for many of the stores it supplies.  (Dkt. No. 6 at 7–8.)  This would cause Olympic to lose additional revenue from decreased sales and goodwill amongst its remaining suppliers as it has a reputation in the industry for being a shelf set captain where suppliers can get the products in more favorable locations within stores.  (*Id*. at 8.)

Constellations responds to Olympic's contentions by arguing it will not suffer any harm by the Court's denial of the preliminary injunction because Olympic was offered compensation for its distribution rights by the successor distributor. (Dkt. No. 19 at 22–23.) Specifically, Constellation argues that the purported $70 million offer for its distribution rights would offset the $5.5 million loses Olympic alleges it will face in the event of termination. (*Id*.) The case law is clear. Although "monetary injuries" are not irreparable, loss of goodwill and reputational harm are.

Constellation fails to address any of the cases cited by Olympic in its briefing on the issue of irreparable harm. (Dkt. Nos. 19 at 22–23; 33 at 11–12.) Nor does Constellation provide any analysis regarding Olympic's contention that termination of the Distribution Agreement would lead to a loss of reputation and goodwill amongst its remaining suppliers and customers. (*Id*.)

As described by Olympic, a termination of the Distribution Agreement would create a cascading effect of shrinking catalogue of products it offers to its customers, reducing its ability to sell its products in those stores, and harming its relationships with its current and potential suppliers. The Court finds this would irreparably harm the goodwill and reputation Olympic has built up over decades in the industry. A harm that cannot be adequately compensated by monetary damages.

### D. A Balancing of Equities Tips in Favor of a Preliminary Injunction

Olympic argues the balance of equities favors Olympic because "failing to issue that injunction will harm Olympic's goodwill, reputation and other aspects of its business that the Distribution Agreement says are difficult to quantify. Olympic will also become an unprofitable company, losing $ 5.5 million dollars a year." (Dkt. No. 4 at 29.)

Constellation disputes Olympic's calculation of its potential financial losses.  (Dkt. No. 19 at 23.)  Constellation also notes it previously contacted many of its retailers that the change of distributors will commence on November 9, 2022.  (Dkt. No. 33 at 12.)

As described above, the termination of the Distribution Agreement would cause Olympic irreparable harm.  Olympic has alleged "the termination of its second largest supplier and most critical to its growth will be a Hindenburg type event, making it a highly unprofitable business and requiring many employees to be fired."  (Dkt. No. 28 at 5.)

Constellation sent notices to many of its retailers of an impending transition of distributors.  Constellation states "[t]he notices were sent to minimize the disruption in the marketplace resulting from the transfer of distribution rights."  (Dkt. No. 33 at 12.)  But Constellation did this despite its awareness that Olympic and the successor distributor have not agreed on the fair market value of the distribution rights, as required by Constellation's own interpretation of the consequence of a without cause termination under the Act.

The Court is persuaded the balance of equities tips in Olympic's favor.

**E.   An Injunction is in the Public Interest**

"The public interest may be declared in the form of a statute."  *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco,* 512 F.3d 1112, 1127 (9th Cir.2008) (internal quotation marks omitted).  Where the elected branches have enacted a statute based on their understanding of what the public interest requires, this Court's "consideration of the public interest is constrained[,] for the responsible public officials . . . have already considered that interest."  *Id.* at 1126–27.  Both Parties dispute whether Constellation's termination without cause violates Washington law.  (Dkt. Nos. 4 at 29–30; 19 at 24.)

The Washington Legislature clearly finds a public interest in the relationship between beer distributors and suppliers.  Wash. Rev. Code § 19.126.010.  It also recognized the

ORDER ON DEFENDANTS' MOTION FOR RECONSIDERATION (DKT. NO. 46) AND PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (DKT. NO. 4) - 14

importance of distributors' ability to continue their distribution rights that they codified "protections which are deemed to be incorporated into every agreement of distributorship." § 19.126.040.  Thus, the Court finds a public interest in maintaining that status quo in the continued enforcement of the Distribution Agreement.

### IV    CONCLUSION

Accordingly, and having considered Plaintiff's motion (Dkt. No. 4), the briefing of the parties, and the remainder of the record, the Court finds and ORDERS:

1. Plaintiff's motion for a preliminary injunction (Dkt. No. 4) is GRANTED.
2. The Court's temporary restraining orders (Dkt. Nos. 40, 45) are CONVERTED into the following preliminary injunction:
   a. Defendants are ENJOINED from terminating the Distribution Agreement without cause.
   b. This Order binds the following who receive actual notice of this Order: (A) the defendants, (B) defendants' officers, agents, servants, employees, and attorneys, and (C) any other persons who are in active concert or participation with one or more defendants or any of defendants' officers, agents, servants, employees, or attorneys.
3. Defendants' motion for reconsideration (Dkt. No. 46) is DENIED.

Dated this 12th day of December, 2022.



David G. Estudillo
United States District Judge