UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CITY BEVERAGES LLC, | CASE NO. 3:22-cv-05756-DGE |
| Plaintiff, | |
| v. | ORDER ON SECOND MOTION FOR TEMPORARY RESTRAINING ORDER (DKT. NO. 91) |
| CROWN IMPORTS LLC et al., | |
| Defendant. | |

## I.     INTRODUCTION

This matter comes before the Court on Plaintiff's second motion for a temporary restraining order.  (Dkt. No. 91.)  For the reasons discussed herein, the Court DENIES the Motion.

## II.     BACKGROUND

### A.  Factual History

Plaintiff is City Beverages, LLC d/b/a Olympic Eagle Beverages ("Olympic Eagle"). (Dkt. No. 1 at 5.)  Defendants are Constellation Brands, Inc. ("Constellation") and Crown

1   Imports, LLC d/b/a Constellation Brands Beer Division ("Crown Imports").  (*Id*.)  Crown

2   Imports is a Constellation wholly-owned subsidiary.  (*Id*. at 6.)

3       Olympic Eagle and Crown Imports operate under a Distribution Agreement originally

4   entered between Barton Beers, LTD ("Barton") and Olympic Eagle (Dkt. No. 5-1), subsequently

5   assigned to Crown Imports (Dkt. No. 5-2 at 2), and then subsequently amended by Crown

6   Imports and Olympic Eagle (*Id*. at 3–8).

7       Constellation has sought to terminate the Distribution Agreement.  Olympic Eagle asks

8   the Court to enter a temporary restraining order preventing transfer of the distribution rights until

9   after compensation due to Olympic Eagle for the distribution rights has been determined by

10  agreement or arbitration.

11      1.  Constellation's Acquisitions through 2013

12      In 1993, Constellation acquired Barton as its wholly-owned subsidiary.  (Dkt. No. 98 at

13  2.)  At that time, Barton was the sole importer of Modelo brand beer in the United States.  (*Id*.)

14  Modelo brand beer includes popular Mexican beer such as Modelo, Pacifica, Corona, and

15  Victoria.  (*Id*.)

16      In 2003, Barton entered into a distribution agreement with Olympic Eagle granting

17  Olympic Eagle the right to distribute Modelo brands in a defined territory in the State of

18  Washington.  (*Id*.)  Since 2003, the Distribution Agreement has been amended multiple times,

19  including granting Olympic Eagle additional distribution rights to new brands or brand

20  extensions in its territory.  (*Id*.; Dkt. No. 5-2 at 3–8.)

21      In 2007, Constellation and Grupo Modelo formed Crown Imports in a 50-50 venture.

22  (Dkt. No. 98 at 2.)  As part of this formation, Constellation's subsidiary (Barton) transferred

23  most all of its assets to Crown Imports, making Crown Imports the supplier of Modelo brand

24

1    beer within the western United States under various distribution agreements, including the 2003

2    Barton Distribution Agreement with Olympic Eagle.  (*Id.*; Dkt. No. 5-2 at 2.)

3          In 2013, beer giant Anheuser-Busch, Inc. ("ABI") was primed to acquire Grupo Modelo.

4    (Dkt. No. 98 at 2–3.)  ABI manufactures, imports, or supplies beer brands in the United States,

5    including the Budweiser, Busch, Michelob, Bud Light, and Natural Light brands.  (*Id.* at 3.)  The

6    Department of Justice, expressing antitrust concerns over this potential acquisition, opposed the

7    deal.  The Department of Justice required Constellation to acquire Grupo Modelo's 50% share of

8    Crown Imports, making Constellation the sole owner of Crown Imports.  (*Id.* at 2–3.)

9          As part of the same action involving the Department of Justice, Constellation additionally

10   "acquired the right to manufacture and distribute the Modelo Brands in the United States in

11   perpetuity."  (*Id.* at 3.)  Where previously Constellation, through its subsidiary, only had the right

12   to import Modelo brand beer from Mexico, as of 2013 Constellation obtained the right to

13   manufacture and distribute Modelo brand beer within the United States.  (*Id.*)  Thus,

14   Constellation, through various wholly-owned subsidiaries, including Crown Imports, has been

15   "the sole brewer and importer of the Modelo Brands in the United States" since 2013.  (*Id.*)

16         Also as part of the 2013 acquisition of the remaining interest in Crown Imports,

17   Constellation was given the right to terminate ABI-owned distributors:

18         [F]or ABI's majority-owned distributors ("ABI-Owned Distributors") that
           distribute Modelo Brand Beer, Constellation will have a window of opportunity to
19         terminate that distribution relationship and direct the ABI-owned distributor to sell
           the distribution rights to another distributor.  Similarly, should ABI subsequently
20         acquire any distributors that have contractual rights to distribute Modelo Brand
           Beer, Constellation may require ABI to sell those rights.
21
22   (Dkt. No. 93 at 26; *see also* Dkt. No. 98 at 3.)

23

24

ORDER ON SECOND MOTION FOR TEMPORARY RESTRAINING ORDER (DKT. NO. 91) - 3

1

2     2.  <u>Constellation's Post-2013 Distributor Terminations</u>

3        In accordance with its authority, Constellation terminated distribution agreements with

ABI-Owned Distributors in 2015 but not distribution agreements with independent distributors

that also distributed ABI products, such as Olympic Eagle.  (Dkt. No. 98 at 3.)  On April 1, 2014

and August 22, 2017, Crown Imports amended the Distribution Agreement with Olympic Eagle

and otherwise reaffirmed its contractual relationship with Olympic Eagle.  (Dkt. No. 5-2 at 3–4.)

        Between 2018 and 2021, "Constellation terminated eight independent California

Distributors (e.g., distributors not owned by ABI)[.]"  (Dkt. No. 98 at 4.)  Constellation asserts

"[t]he decision to terminate these distributors had nothing to do with Constellation's acquisition

of the remaining ownership interest in Crown Imports back in 2013[.]"  (*Id*.)  Instead,

Constellation states these terminations were made after it "evaluated the territories and markets

and determined that its interests would be better served by other distributors."  (*Id*.)

Constellation states that "[a]pproximately 17% of Constellation's beer volume is sold by

distributors that concurrently distribute ABI products and approximately 34% of Constellation's

beer distributors also sell ABI brands."  (*Id*.)  It identifies that "there is at least one distributor in

California with concurrent ABI and Constellation distribution rights; Constellation has no plans

to terminate this distributor."  (*Id*.)

        Notwithstanding that Crown Imports is the only signatory to the Distribution Agreement

at issue in this litigation, Constellation and Crown Imports admitted that "Constellation is the

beverage supplier under the Distribution Agreement."  (*Compare* Dkt. Nos. 1 at 7 and 52 at 6.[1])

---

[1] During oral argument on the present motion, the Court questioned whether Olympic Eagle had alleged facts sufficient to pierce Crown Imports' corporate veil or to conclude that Crown Imports was Constellation's alter ego.  Because Constellation admitted it was the "supplier" under the Distribution Agreement, the Court assumes Constellation and Crown Imports are one and the same for purposes of this motion.

1

**B.  Procedural History**

2          On September 8, 2022, Constellation informed Olympic Eagle it was terminating the

3   Distribution Agreement.  (Dkt. No. 7 at 2.)  On October 6, 2022, Olympic Eagle filed a

4   complaint, requesting preliminary and permanent injunctions against Constellation/Crown

5   Imports' without-cause termination of the Distribution Agreement.  (Dkt. No. 1.)  Olympic Eagle

6   put forth three bases for relief:  Washington's Wholesale Distributor/Supplier Equity Agreement

7   Act, Washington's Franchise Investment Protection Act, and the plain terms of the Distribution

8   Agreement itself.

9          On November 4, 2022, Olympic Eagle filed a temporary restraining order ("TRO")

10  requesting the Court prevent termination of the Distribution Agreement while it adjudicated the

11  then-pending preliminary injunction.  (Dkt. No. 28.)  On November 8, 2022, the Court granted

12  the TRO.  (Dkt. No. 40.)  On December 12, 2022, the Court ruled in favor of Olympic Eagle on

13  the preliminary injunction and enjoined Constellation from terminating the Distribution

14  Agreement without cause.  (Dkt. No. 51.)  In its preliminary injunction order, the Court reasoned

15  that Olympic Eagle was likely to succeed on the merits based on its interpretation that the

16  Wholesaler Act did not allow without-cause terminations.  On January 4, 2023, Constellation

17  appealed to the Ninth Circuit.  (Dkt. No. 55.)  On July 20, 2023, the Ninth Circuit vacated the

18  preliminary injunction.  (Dkt. No. 78.)  It concluded, "[a]lthough the text of the Act does not

19  expressly state that suppliers always have the right to terminate distribution agreements without

20  cause, it clearly allows a supplier to contract for that right."  (*Id*. at 2.)  It further concluded,

21

22

23

24

1 "[t]he [Distribution] Agreement grants [Constellation/Crown Imports] the right to terminate

2 without cause." (*Id.* at 4.[2])

3     On July 21, 2023, "Constellation issued notice to Olympic Eagle . . . stating that it 'is

4 terminating the Distribution Agreement dated October 22, 2003.'" (Dkt. No. 86 at 2.)

5     The parties, and the presumed successor distributor CoHo Distributing LLC

6 ("Columbia"), agreed the termination of the Distribution Agreement would not become effective

7 until 60 days from the July 21, 2023 termination notice or 30 days after the Ninth Circuit's

8 mandate issued, whichever was later. (*Id.* at 4.) The parties also stipulated to modify the

9 deadlines set forth in Washington Revised Code § 19.126.040(7)–(8),[3] and instead agreed that,

10 "[i]n the event that the termination contemplated by the Termination Notice becomes effective,

11

12 [2] As to Olympic Eagle's Franchise Investment Protection Act claim, the Ninth Circuit determined such claim would unlikely succeed and that, even if Olympic Eagle could establish such claim, it was likely that Olympic Eagle waived any right to injunctive relief as a remedy for a Franchise

13 Investment Protection Act violation. (*Id.* at 4–5.)

14 [3] The provisions provide:

15       (7) In the event the terminated distributor and the successor distributor do not agree on the fair market value of the affected

16       distribution rights within thirty days after the terminated distributor is given notice of termination, the matter must be submitted to

17       binding arbitration. Unless the parties agree otherwise, such arbitration must be conducted in accordance with the American

18       arbitration association commercial arbitration rules with each party to bear its own costs and attorneys' fees;

19       (8) Unless the parties otherwise agree, or the arbitrator for good cause shown orders otherwise, an arbitration conducted pursuant to

20       subsection (7) of this section must proceed as follows: (a) The notice of intent to arbitrate must be served within forty days after the

21       terminated distributor receives notice of terminated distribution rights; (b) the arbitration must be conducted within ninety days after

22       service of the notice of intent to arbitrate; and (c) the arbitrator or arbitrators must issue an order within thirty days after completion of the arbitration[.]

23 Wash. Rev. Code § 19.126.040(7)–(8).

24

ORDER ON SECOND MOTION FOR TEMPORARY RESTRAINING ORDER (DKT. NO. 91) - 6

1   and Olympic Eagle and Columbia do not agree on the fair market value of the affected

2   distribution rights within thirty-five days following the issue of the Ninth Circuit's Mandate . . .

3   the matter must be submitted to binding arbitration[.]" (*Id*.)  The stipulation contained a clause

4   noting that "Nothing in this Stipulation shall be construed as a waiver by either party of any

5   claims, defenses, or any other rights related to this dispute." (*Id*. at 5.)  It also clarified that,

6   "[f]or the avoidance of doubt, Olympic Eagle disputes Constellation's right to terminate the

7   distribution agreement." (*Id*.)

8         On September 19, 2023, the Ninth Circuit denied Olympic Eagle's request for rehearing

9   en banc. (Dkt. No. 88.)  The Ninth Circuit issued its mandate on October 12, 2023, effectuating

10  its July 20, 2023 judgment. (Dkt. No. 89.)

11        Constellation asserts that, per the parties' stipulation, the Distribution Agreement should

12  be terminated on November 10, 2023, 30 days after the mandate issued.  On October 31, 2023,

13  Olympic Eagle filed a second temporary restraining order, arguing termination cannot take place

14  until after the fair market value of the distribution rights has been determined. (Dkt. No. 91.)

15  **C.  Claims of Irreparable Harm.**

16        Olympic Eagle identifies, it "would need to expand geographically or acquire additional

17  brands to try to make up for the significant loss of revenue and profit from the loss of

18  Constellation brands." (Dkt. No. 92 at 3.)  It states, "[t]his will take time and significant amounts

19  of money." (*Id*.)  At the same time, it acknowledges that "[e]ven with time and money, success

20  [in expanding or acquiring new brands] is highly speculative as [it] [has] tried to buy significant

21  brands in the past and [has] been unsuccessful." (*Id*.; *see also* Dkt. No. 93 at 6) ("Because we

22  have sought to buy other significant brands in the past and have been unsuccessful, it is

23  speculative in the least to say that we will succeed now.")).

24

1    Olympic Eagle identifies that "[t]he second notice from Defendants of losing

2    Constellation brands put Olympic Eagle in default on its loan from Wells Fargo." (Dkt. No. 92

3    at 3.)  It has $11 million currently outstanding on its bank loan.  (*Id*.)  "Wells Fargo has put

4    Olympic Eagle on notice that the bank could refuse to let Olympic Eagle borrow additional funds

5    on [its] current loan[.]" (*Id*.)  Olympic Eagle asserts "it will be difficult if not impossible to

6    obtain new financing in an amount necessary to satisfy [its] working capital needs and reinvest in

7    the business from another bank because of . . . reduced cashflows from losing Constellation's

8    brands." (*Id*. at 4.)  It asserts it will face significant financial repercussions if the transfer of

9    rights occurs before it "receive[s] a fair market value payment[.]" (*Id*.)

### III.   DISCUSSION

### A.  The Parties' Stipulation

11    Constellation asserts the negotiated stipulation entered on August 28, 2023 precludes

12    Olympic Eagle from raising any argument under Washington Revised Code § 19.126.040(4).

13    (Dkt. No. 97 at 7–8.)

15    Notwithstanding the Parties' stipulation as to the procedure related to Constellation's

16    termination notice, the timing of its effect and the transfer of distribution rights, it is undeniable

17    that Olympic has not waived its claims asserted in this Motion.  (Dkt. No. 86 at 5) ("Nothing in

18    [the] Stipulation shall be construed as a waiver by either party of any claims, defenses, or any

19    other rights related to this dispute.  For the avoidance of doubt, Olympic Eagle disputes

20    Constellation's right to terminate the distribution agreement.").  Based on explicit language in

21    the Stipulation, the Court concludes the stipulation has no effect on Olympic Eagle's attempt to

22    seek a temporary restraining order under a new theory.

### B.  Temporary Restraining Order – Legal Standard

1      A TRO is "an extraordinary remedy that may only be awarded upon a clear showing that

2 the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24

3 (2008).  The standard for issuing a TRO is the same as that of a preliminary injunction.  It

4 requires a party to demonstrate "(1) 'that he is likely to succeed on the merits, (2) that he is likely

5 to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips

6 in his favor, and (4) that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586

7 F.3d 1109, 1127 (9th Cir. 2009) (citing *Winter*, 555 U.S. at 20).

8      As an alternative to the *Winter* test, a preliminary injunction is appropriate if "serious

9 questions going to the merits were raised and the balance of the hardships tips sharply in the

10 plaintiff's favor," thereby allowing preservation of the status quo when complex legal questions

11 require further inspection or deliberation.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d

12 1127, 1134-35 (9th Cir. 2011).  However, "'serious questions going to the merits' and a balance

13 of hardships that tips sharply towards the plaintiff can support issuance of a preliminary

14 injunction, *so long as* plaintiff also shows that there is a likelihood of irreparable damage and

15 that the injunction is in the public interest." *Id.* at 1135 (emphasis added).  The moving party

16 bears the burden of persuasion and must make a clear showing that it is entitled to such relief.

17 *Winter*, 555 U.S. at 22.

18 **C.  TRO Analysis**

19      Olympic Eagle argues Washington Revised Code § 19.126.040(4) prohibits Constellation

20 from "terminating Olympic Eagle['s Distribution Agreement] until after the fair market value

21 arbitration initiated by Columbia has concluded."  (Dkt. No. 91 at 12.)  It asserts the termination

22 of the Distribution Agreement in this case results from Constellation's 2013 acquisition of

23 manufacturing and distribution rights and Constellation's election to transfer the Distribution

24

Agreement from Olympic Eagle to Columbia.  (*Id*. at 16–18.)  As support, Olympic Eagle notes that Constellation's 2013 acquisition of manufacturing and distribution rights made Constellation ABI's direct competitor, and asserts that ABI "would not be terminating its own distributors without cause . . . [and] thus the termination is a consequence of Constellation acquiring control of the [Modelo] brands."  (*Id*. at 18.)  At a minimum, Olympic Eagle argues there are serious questions as to whether § 19.126.040(4) prevents the transfer of the Modelo brands to Columbia until after the fair market value arbitration is completed.  (*Id*. at 20.)

Constellation argues Olympic Eagle is not likely to prevail on its claims that § 19.126.040(4) bars transfer of distribution rights until after completion of the fair market value arbitration.  It asserts there must be a direct connection between the acquisition of new rights *and* the election of a different distributor; otherwise, "any decision to terminate a distributor would ultimately be a consequence of its past acquisition of brand rights" as "any termination . . . necessarily 'results from' its prior acquisition of those rights." (Dkt. No. 97 at 15.)  Constellation further asserts Olympic Eagle advances "conspiracy theories and speculation" to argue the termination in this case resulted from acquisition of rights that occurred nine years prior to the notice of termination.  (*Id*. at 17.)  Constellation points out that it executed amendments to the Distribution Agreement with Olympic Eagle after the 2013 acquisition reaffirming Olympic Eagle's distributor status and that currently "34% of its distributors nationwide also distribute ABI products."  (*Id*. at 15.)  If further offers that its subsequent market evaluations performed well after the 2013 acquisition drove the decision to terminate Olympic Eagle's Distribution Agreement, not the fact that it acquired rights in 2013.  (*Id*.)

Washington Revised Code § 19.126.040(4) provides in part:

> . . . In the case of terminated distribution rights resulting from a
> supplier acquiring the right to manufacture or distribute a particular

1

2

> brand and electing to have that brand handled by a different
> distributor, the affected distribution rights will not transfer until such
> time as the compensation to be paid to the terminated distributor has
> been finally determined by agreement or arbitration[.]

3

4      At issue is whether the termination of the Distribution Agreement resulted from

5  Constellation's 2013 acquisition of rights and its election to change distributors.  The phrase

6  "resulting from" is not defined in the statute.  Nor does there appear to be a decision interpreting

7  this phrase as used in this statute.

8      Olympic Eagle argues "resulting from" requires only that the termination "is a

9  consequence of" Constellation's 2013 acquisition of manufacturing and distribution rights.  (Dkt.

10  No. 91 at 18.)  As support, Olympic Eagle relies on the dictionary definition of "result" and a

11  state court decision, *State v. Velezmoro*, 384 P.3d 613 (Wash. Ct. App. 2016).  In the context of a

12  state criminal restitution statute, *Velezmoro* recognized the application of a "but-for" test in

13  applying the term "resulting from."  It stated and held:

14
> Generally, the but-for test is the way to prove that one event was the factual cause
> of another. But where the application of that test leads to anomalous results,
> alternative ways of proving causation may apply. In the circumstances here, where
> an unknown number of people possessed pornographic images of Vicky's abuse,
> each possessor had a share in causing her harm. The trial court did not err in
> determining that Velezmoro's offense was a cause of Vicky's loss. We affirm.

15

16

17  384 P.3d at 614.  Accordingly, Olympic Eagle asserts "but-for" or actual causation is all that

18  § 19.126.040(4) requires.  (Dkt. No. 100 at 3–4.)

19      Constellation disputes *Velezmoro*'s application.  It asserts, "the question is whether an

20  event (acquisition of brand rights) resulted in the supplier's act (termination).  In other words, it

21  presents a question of the supplier's motivation . . . [,] not whether the acquisition of brand rights

22  was in the chain of events leading to the termination."  (Dkt. No. 97 at 17.)  Furthermore,

23  Constellation argues, Olympic Eagle's interpretation "merely requires that a brand acquisition

24

occur at any point before the termination.  But that would include virtually *all* terminations and the exception would swallow the rule."  (*Id.*)

The Court agrees "resulting from" as used in § 19.126.040(4) indicates a "but-for" or actual causation requirement but disagrees that the acquisition factor should be considered in isolation from the election factor.  In other words, because § 19.126.040(4) requires that termination results from the acquisition of rights <u>and</u> the election of a new distributor, both requirements relative to one another must be the actual, or but-for, cause of the termination.  To fail to recognize a relationship between the two criteria would mean that every termination would fall within § 19.126.040(4) regardless of when the election of a new distributor occurred relative to the acquisition of rights and regardless of whether the decision to elect a new distributor was for reasons completely independent of the acquisition of the rights.[4]

With this understanding in mind, the Court considers whether Olympic Eagle has established it is entitled to a temporary restraining order.

1.  <u>Likelihood of Success</u>

Pointing to its current Equity Agreement with ABI, Olympic Eagle asserts its rights under the 2003 Barton Distribution Agreement (and subsequent amendments) "would not have been terminated without cause" because the ABI Equity Agreement "does not allow AB to terminate . . . without cause."  (Dkt. No. 93 at 6.)  According to Olympic Eagle, this shows the termination of the Distribution Agreement resulted from Constellation's 2013 acquisition of rights.

---

[4] For example, under Olympic Eagle's interpretation, if Company A acquired rights in 1901 and subsequently, 100 years later in 2001, decided to elect a new distributor for reasons completely unrelated to the acquisition that occurred in 1901, the terminated distributor could avail itself of § 19.126.040(4).  This scenario, in the Court's view, would be an inappropriate application of § 19.126.040(4)

1

But this conclusion is speculative.  Even if ABI had completed its acquisition of Modelo

2  Grupo in 2013, it is unknown whether ABI would have maintained the 2003 Barton Distribution

3  Agreement as-is, whether it would have modified it, whether it would have terminated it, or

4  whether it would have negotiated a new distribution agreement covering Modelo brands identical

5  or even similar to the Equity Agreement under which Olympic Eagle currently operates.[5]

6  Accordingly, reliance on Olympic Eagle's Equity Agreement to establish the termination of the

7  Distribution Agreement resulted from the 2013 acquisition of rights is misplaced.

8

Alternatively, Olympic Eagle argues the Distribution Agreement's termination, initially

9  attempted in 2022, resulted from Constellation's 2013 acquisition of rights because it became

10  ABI's direct competitor and chose to exercise its right to terminate ABI-owned Distributors in

11  2015.  (Dkt. No. 100 at 4–7.)  As the theory goes, because Constellation terminated the Seattle

12  ABI distributor in 2015 and transferred those rights to Columbia, Olympic Eagle's termination

13  nine years after the 2013 acquisition and seven years after the termination of the Seattle ABI

14  distributor is the culmination of Constellation's desire "to consolidate its Puget Sound area

15  distribution."  (Dkt. No. 100 at 6.)  Put another way, "Olympic Eagle's termination is a

16  continuation of Constellation's efforts to redirect its route to market for the Modelo brands it

17  manufactures away from the distributors aligned with its competitor[.]"  (Dkt. No. 91 at 8–9.)

18

The challenge with this theory is that it is just a theory, based solely on Olympic Eagle's

19  belief as to Constellation's motives and the timing of such motives relative to the 2013

20  acquisition of rights.  Olympic Eagle presents no facts establishing that, as of 2013, Constellation

21

22

23

24

---

[5] The Department of Justice clearly was concerned about the anti-trust implications of ABI's acquisition of Modelo and, arguably, ABI could have directed distribution of Modelo brands to ABI-owned distributors.  The point is one simply does not know what ABI would have done with the 2003 Barton Distribution Agreement had it acquired Modelo.

planned to eliminate all ABI-affiliated distributors from distributing Modelo brands.[6]  In contrast, the record establishes that after the 2013 acquisition of rights, Olympic Eagle's distribution rights were twice affirmed through amendments to the Distribution Agreement, and nine years lapsed between acquisition of rights and the first attempt to terminate the Distribution Agreement.  It also is undisputed that Constellation continues to maintain distribution agreements with ABI-affiliated distributors, currently making up 34% of its distributors.

Furthermore, although Constellation only received manufacturing and distributing rights for Modelo brand beer in 2013, it had been sole importer of the beer, via its subsidiaries Barton and Crown Imports, since 1997.  If Constellation had wanted to freeze out ABI-affiliated distributors from selling Modelo brand beer to their retailers, it could have done so any time after 1997.  Constellation's acquisition of manufacturing and distribution rights in 2013 did not provide it with any additional power to cut off ABI-affiliated distributors from Modelo brand products; as sole importer, that power was already in its hands.

Accordingly, based on the record presented, Olympic Eagle fails to establish it will likely succeed on its claim that the termination of the Distribution Agreement resulted from Constellation's acquisition of rights *and* its election of a different distributor.

This factor weighs against a preliminary injunction.

2.   Irreparable Harm

For purposes of this Motion, the Court focuses on the harm that would result from the immediate transfer of rights versus a transfer occurring after arbitration.  This is because harm to

---

[6] At oral argument, Olympic Eagle asserted it was prevented from conducting further discovery on this and other issues because of the discovery stay.  However, Olympic Eagle never argued discovery was necessary to establish a claim under § 19.126.040(4).  In fact, as Constellation notes, the § 19.126.040(4) claim was never previously raised.

Olympic Eagle appears inevitable as the Ninth Circuit has already ruled the Distribution

Agreement grants Constellation the ability to terminate its distributions rights without cause—

and Constellation in fact has initiated such termination.  Thus, the issue is whether irreparable

harm will result from immediate transfer of rights versus eventual transfer.  This is a harm

distinct from the irreparable harm already resulting from the termination of the Distribution

Agreement.

"Irreparable harm is traditionally defined as harm for which there is no adequate legal

remedy, such as an award of damages."  *Arizona Dream Act Coal. V. Brewer*, 757 F.3d 1053,

1068 (9th Cir. 2014) (citation omitted).  In other words, "financial injury . . . will not constitute

irreparable harm if adequate compensatory relief will be available in the course of litigation."

*Mountaineers Foundation v, The Mountaineers*, 2023 WL 36333430 (W.D. Wash. May 24,

2023) (quoting *Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*, 739 F.2d 466, 471 (9th

Cir. 1984) (internal quotations omitted).

Olympic Eagle asserts the transfer of rights cannot occur immediately because it cannot

wait until arbitration to receive compensation.  It needs to take steps to expand geographically or

acquire additional brands to make up for the loss of revenue and profit that will occur from

losing the Modelo brand.  However, Olympic Eagle presents no evidence that it has current

opportunities to expand or acquire new brands.  Rather, it notes that "success is highly

speculative" and that past attempts to buy additional brands have been unsuccessful.  Moreover,

the record lacks information as to Olympic Eagle's current financial status.  There is no

information about its current assets relative to the funds it would take to acquire new brands or

territory.  Thus, even if Olympic Eagle received immediate payment through arbitration, it is

speculative as to whether it would succeed in expanding or acquiring new brands.

1    Olympic Eagle also identifies that it already is in default of its bank loan as a result of

2    Constellation's termination notice.  This means the transfer of rights now or after arbitration does

3    not impact its default status.  And, while Olympic Eagle identifies that its bank has given it

4    notice that it "could refuse" additional funds, the record does not establish the bank would refuse

5    additional funds if the transfer of rights were to immediately occur.  And while there certainly

6    will be financial repercussions, Olympic Eagle does not identify that its operations would cease

7    if an immediate transfer occurs.  Again, financial harm is inevitable because a termination is

8    occurring.

9    Olympic Eagle also asserts harm from the loss of goodwill due to the transfer of rights.

10   This loss of goodwill results from the termination of the Distribution Agreement and not so

11   much as a result of whether the transfer occurs now or after arbitration.

12   Based on the record presented, the Court is unable to find Olympic Eagle has put forth

13   sufficient evidence to show it will face irreparable harm that is *distinct* from the harm caused by

14   the termination of the Distribution Agreement.

15   This factor weighs against a preliminary injunction.

16   3.   Balance of Equities

17   While the Court concludes Olympic Eagle has not identified irreparable harm resulting

18   from immediate transfer that is distinct from the irreparable harm caused by the termination of

19   the Distribution Agreement, the harm Olympic Eagle would suffer if a preliminary injunction

20   were not granted is still greater on balance than the harm Constellation would suffer from the

21   issuance of a permanent injunction.

22   This is because any harm Constellation complains of would only be temporary.

23   Constellation holds all rights to manufacture and distribute the Modelo brands.  It owns the

24

1    Modelo brand market in the region subject of the Distribution Agreement.  There is no evidence

2    that Constellation, through its distributors, would be unable to maintain its relationships with the

3    retailers or that sales of its products would forever be injured.  In fact, there is no evidence there

4    would be a gap in the delivery of Modelo products to retailers if an injunction were granted.

5    Thus, as compared to the financial harm Olympic Eagle will suffer from a delay in

6    compensation, Constellation likely would not suffer any significant financial harm.

7            This factor weighs in favor of granting the Motion.

8            4.  Public Interest

9            "When the reach of an injunction is narrow, limited only to the parties, and has no impact

10   on non-parties, the public interest will be 'at most a neutral factor in the analysis rather than one

11   that favor[s] [granting or] denying the preliminary injunction.'"  *Stormans, Inc.*, 586 F.3d at

12   1138–1139 (citations omitted).  "If, however, the impact of an injunction reaches beyond the

13   parties, carrying with it a potential for public consequences, the public interest will be relevant to

14   whether the district grants the preliminary injunction.  *Id*. at 1139.

15           Olympic Eagle argues that "compliance with the law" is in the public interest.  (Dkt. No.

16   91 at 26.)  Olympic Eagle contends that Constellation violated the law in terminating their

17   Distribution Agreement without cause and so the TRO is in the public interest.  (*Id*.)

18   Notwithstanding Olympic Eagle's belief that Constellation violated the law in terminating

19   Distribution Agreement without cause, the Ninth Circuit has already determined Constellation's

20   without cause termination is lawful.  (Dkt. No. 78 at 4) ("The [Distribution] Agreement grants

21   [Constellation/Crown Imports] the right to terminate without cause.")  Thus, determination of

22   compensation for the distribution rights is a private affair resting squarely in the interests of the

23   parties and not the public.  And, because it does not appear the termination of the Distribution

24

Agreement would create a lapse in the public's ability to purchase Modelo products, there is no impact on the public.

This factor weighs against a preliminary injunction.

5. *Wild Rockies/Winter* Alternative Test Not Applicable

Olympic Eagle argues that in the event it is unable to convince the Court of its likelihood of success on the merits of its § 19.126.040(4) claim, at a minimum it has raised serious questions about the merits of its claim, which means the alternative *Wild Rockies/Winter* test for obtaining injunctive relief applies. (Dkt. No. 91 at 20.)

However, as already noted, the alternate *Wild Rockies/Winter* is inapplicable if a petitioner fails to establish the likelihood of irreparable damage and that the injunction is in the public interest. *Alliance for the Wild Rockies*, 632 F.3d at 1135 ("'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as plaintiff also shows that there is a likelihood of irreparable damage and that the injunction is in the public interest.").

Having concluded the records fails to establish irreparable damage or public interest in the grant or denial of a preliminary injunction, Olympic Eagle is not entitled to relief under the *Wild Rockies/Winter* test.

1

## IV.    CONCLUSION

Because Olympic Eagle has failed to establish a likelihood of success, irreparable harm,

or that a grant of the Motion is in the public interest, the Court DENIES Plaintiff Olympic

Eagle's second motion for a temporary restraining order.  (Dkt. No. 91.)

Dated this 9th day of November 2023.


David G. Estudillo
United States District Judge